849 So.2d 95 (2003)
Willie C. RUSSELL
v.
STATE of Mississippi.
No. 97-DR-00046-SCT.
Supreme Court of Mississippi.
June 19, 2003.
*102 Clive A. Stafford Smith, attorney for appellant.
Marvin L. White, Jr., Office of the Attorney General, attorneys for appellee.
EN BANC.
WALLER, Justice, for the Court.
¶ 1. Willie C. Russell was convicted of capital murder and sentenced to death for the murder of Argentra Cotton, a Mississippi Department of Corrections (MDOC) officer, on July 18, 1989, at the Mississippi State Penitentiary at Parchman. Russell was an inmate at the time of the murder, serving time on a conviction of armed robbery. On his first direct appeal to this Court, Russell's capital murder conviction was affirmed, but his sentence of death was reversed and remanded due to the circuit court's failure to determine Russell's habitual offender status prior to his sentencing hearing. See Russell v. State, 607 So.2d 1107 (Miss.1992). Russell was sentenced to death by the second sentencing jury. On direct appeal this Court affirmed the second death sentence. Russell v. State, 670 So.2d 816, 820 (Miss. 1995), cert. denied, 519 U.S. 982, 117 S.Ct. 436, 136 L.Ed.2d 333 (1996). Pursuant to the Mississippi Post-Conviction Collateral Relief Act, Miss.Code Ann. §§ 99-39-1 to -29 (Rev.2000 & Supp.2002), Russell filed his Amended Petition for Post-Conviction Relief with this Court, the State has filed its Response, and Russell has filed his Second Amendment and Reply to Response, and the State has filed its Response. After thorough consideration the Court denies relief to Russell on all issues but one, that being Russell's claim that he is mentally retarded. On that issue the Court grants Russell leave to file in the Sunflower County Circuit Court a motion *103 seeking post-conviction relief vacating his death sentence based upon his alleged mental retardation.

FACTS
¶ 2. The following statement of facts is taken from this Court's opinion on Russell's appeal from his second death sentence:
On July 18, 1989, while an inmate at the State Penitentiary in Parchman, Russell removed the 16" by 10" bottom air vent in his cell door, crawled through the space, and managed to secrete himself behind the stairwell pillar on the lower level of the unit in which he was housed. Russell, armed with a "shank," (homemade knife) waited in ambush for Corrections Officer Cotton. Russell's patience was rewarded at approximately 6:50 p.m. when Officer Cotton entered Zone 3 in which Russell was hiding. Cotton, unaware of Russell's presence, attempted to lock the door between Zone 2 and Zone 3. While Cotton's back was turned, Russell rushed Cotton and proceeded to stab him with the shank.
Officer Cotton, surprised by Russell's attack, attempted to escape by using a plastic food tray to repulse Russell's assault. Nonetheless, Russell followed Cotton, stabbed him in the back, and then held Cotton down with his knee and continued to stab him. During the attack, Russell's attention was momentarily drawn away by another guard allowing Cotton the opportunity to retreat into the guard control tower. Upon reaching the safety of the guard tower, Officer Cotton called for and received medical help. Cotton was first taken to the Parchman emergency room and subsequently transferred to the Bolivar County Hospital where he died as a result of internal bleeding. Russell, 607 So.2d at 1109-10.
Subsequently, Russell was indicted and convicted for killing a peace officer acting in his official capacity as a Correctional Officer of the Mississippi State Penitentiary in violation of Miss.Code Ann. § 97-3-19(2)(a). At trial, Russell took the stand and testified that he stabbed Officer Cotton because Cotton had taken twenty dollars from him in order to buy yeast for Russell. Evidently, Russell was going to use the yeast to make an alcoholic drink. However, according to Russell's testimony, Cotton never delivered the yeast, nor did he return Russell's twenty dollars.
The jury, after hearing overwhelming evidence as to Russell's guilt, returned a guilty verdict. After finding Russell guilty of capital murder, the jury sentenced Russell to death. On appeal, this Court affirmed the jury's determination of Russell's guilt, but reversed his death sentence as Russell, indicted as a habitual offender, was not allowed a habitual offender hearing before the penalty phase of his trial. See Turner v. State, 573 So.2d 657 (Miss.1990).
On Russell's resentencing, the venire and subsequent sentencing jury were drawn from Montgomery County Mississippi. However, for security reasons and the ease and convenience of transporting witnesses into court from Parchman, the trial was held in Sunflower County.
The second jury, after hearing evidence of the murder and all of the evidence that would tend to establish mitigating factors and aggravating factors, sentenced Russell to death. Specifically, the jury found the following aggravating factors: (1) The capital offense was committed by a person under a sentence of imprisonment; and (2) The Defendant was previously convicted of another capital offense or of a felony involving the *104 use or threat of violence to the person. Likewise, the jury found that there were "insufficient mitigating circumstance [sic] to outweigh the aggravating circumstance(s)."
Russell, 670 So.2d at 820.

The Stabbing of Officer Cotton as told in 1990
¶ 3. The version of the stabbing the jury heard in the 1990 trial came primarily from the testimony of A.J. Smith, Christopher Womber, Calvin Lee, Sylvester Clark and Russell himself.
¶ 4. Smith testified as follows: He was an inmate floorwalker for Officer Cotton on July 18, 1989, and was helping Officer Cotton serve the last meal of the day to the inmates when the stabbing took place. Officer Cotton was trying to lock the door between Zone 2 and 3 in Unit 24-B when Russell stabbed Officer Cotton in the back with a knife. Russell and Officer Cotton wrestled and fought and then went up the stairs and fought again. Russell stabbed Officer Cotton again at this time. At this time Officer Calvin Lee came to Officer Cotton's aid, striking Russell with Lee's night stick. Then Officer Cotton got away from Russell and both he and Lee went to the tower and locked the door. Officer Cotton did not have a weapon, and all Officer Cotton had in his hands, while trying to fight off Russell, was a plastic food tray. Russell stabbed Officer Cotton four or five times.
¶ 5. Christopher Womber, another inmate, corroborated most of Smith's testimony and testified as follows: He was in cell 33 in Unit 24-B on the date of the stabbing. An MDOC Officer Jones arrived after the stabbing and asked for the knife and Russell gave it to him. Russell stated that Officer Cotton had been "f* *king with him for three or four months." After Russell stabbed Officer Cotton the first time, Russell backed up, and then the two started fighting with the food trays. Russell could have followed Officer Cotton and Officer Lee into the control tower after the stabbing but did not, because there was a set of keys lying on the floor after the fight.
¶ 6. Calvin Lee, an MDOC officer working with Officer Cotton, testified as follows: He was in the control tower doing paper work while Officer Cotton was feeding the inmates with the Smith's help on July 18, 1989. The incident occurred about 6:50 p.m. At that time he heard a loud noise in Zone 3, "like all the food trays had been turned over." Lee left the tower and saw Russell swinging at Officer Cotton with a knife and Officer Cotton swinging a food tray for protection and backing away. Lee went back to the tower, got a night stick, and went back to the two, ordering Russell to drop the knife. When Russell refused and continued swinging the knife, Lee struck him "around his head and neck area" with the nightstick, breaking the stick. Russell turned his attention to Lee momentarily, but then went back to fighting with Officer Cotton. Lee followed the two, swinging his night stick at Russell again. At this time Officer Cotton was able to get away and into the control tower, followed by Lee. Lee saw Russell stab Officer Cotton twice.
¶ 7. Sylvester Clark, an MDOC officer, received a call from Officer Cotton. Officer Cotton told him that "he was having problems with inmate Willie Russell acting a fool over in "B" building." Officer Cotton "sounded as if he was out of breath." Officer Clark and several other officers went to 24-B Building. When they arrived, Officer Cotton was sitting at his desk writing in the register. Officer Cotton pointed to where Russell was standing. Officer Clark saw Russell "standing over *105 in zone three all bloody with a sharp instrument in his hand and he was just standing there." Officer Clark went over to Russell and ordered him to drop the shank. Russell refused and yelled back, "come on with it." Officer Clark started back to get a gun which shoots wooden blocks when an Officer Jones told him to wait a minute. Officer Jones then spoke to Russell and Russell gave Officer Jones the shank. Russell was then restrained and handcuffed. According to Officer Clark, Russell then stated, "I stabbed that m.f. over there.... I told that m.f. that I was going to get him." After Russell was restrained, Officer Clark and the others went into the control tower and noticed that Officer Cotton was slipping out of his chair. They discovered at this time that the front of Officer Cotton's shirt was bloody. Officer Clark dialed the emergency number at Parchman. Officer Clark said he received Officer Cotton's call at around 6:50 p.m.
¶ 8. Rayford Jones, an MDOC officer, accompanied Officer Clark to 24-B Building when Officer Clark received a call from Officer Cotton. Officer Jones said Russell was standing in zone three and "he had blood all over his body from top all the way down at least to his waist."
¶ 9. Russell testified at trial as follows: He was supposed to be out as a floor walker on July 18, 1989, the date of the stabbing, but Officer Cotton and Officer Lee would not let him out. This made him angry. He gave Officer Cotton twenty dollars to get him some yeast so that Russell could make some "buck," or home made alcohol. Officer Cotton had done this for Russell before. This time Officer Cotton kept Russell's money and refused to bring him the yeast. This also made Russell angry. He had a discussion about it with Officer Cotton on July 18 "about 6:15 or 6:10," which degenerated into an argument. Russell "just got real mad and angry with him and lost control from the whole matter." He had a knife in his hand and "I was intending to scare him with the knife. I didn't mean to stick him or nothing. He was facing me and I just lost all control and I stabbed him. I really didn't mean to stab him...." Before the fight Officer Cotton's left hand was in his pocket, and Russell "thought maybe he might have a knife in his pocket. After he saw me and I was approaching him, when I was about three or four feet from him and he saw I was coming, he pushed his hand in his pocket. I don't know what he might have had a knife or something. I didn't really know but it kinda scared me." Russell had seen several other MDOC officers carry knives, and about a week before July 18 he had seen Officer Cotton with some kind of knife.
¶ 10. Approximately two hours after the stabbing, Russell was interviewed by Charles Rogers, a Mississippi Highway Patrol investigator. Russell gave a statement to Officer Rogers which was similar to Russell's trial testimony and includes additional matters not covered at trial. Russell stated that the grate to his prison door was rigged so that he could get out of his cell even when it was locked, and that was how he got out on this occasion. Russell once again mentioned Officer Cotton going into his pocket during their confrontation, and stated that he knew Officer Cotton carried a knife. The rest of Russell's statement, as to the main points of the stabbing, is similar to Smith, Womber and Officer Lee's testimony. Russell stated that he had been having trouble with gangs, but did not say specifically what kind of trouble.
¶ 11. This statement was excluded before trial by the circuit court pursuant to Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because *106 Russell had first exercised his right to remain silent, and then MHP Officer Rogers, soon after Russell's first refusal to speak, questioned him again, without Russell having a chance to speak with an attorney, resulting in this statement. The State was allowed to impeach Russell with the statement at trial. The State's primary area of impeachment was to get Russell to admit that he had gotten out of his cell through the grate. On cross-examination Russell stated that during the stabbing he was not afraid but was out of control.

Recanted Testimony
¶ 12. Russell's affidavit, Exhibit A to his Amended Petition, states the following: Russell never trusted his trial attorneys. He thought they did not know what they were doing and they did not care about what happened to him. From the start, he told them the truth about what happened, that Officer Cotton's stabbing happened because Russell had interfered in gang business. The specific gang in question, the Gangsta Disciples ("GDs"), made it clear that it would get revenge against Russell. Russell started getting threats from the GDs. Russell knew that Officer Cotton was involved with the prison gangs because of the money they could pay him through money order scams. It was made clear to Russell that he could not tell the whole truth at trial. Russell heard on July 18, 1989, that "something was going to go down. It was when Officer Cotton and Officer Lee were on duty. Officer Lee was a drunk, and I did not think he would be behind it. But Officer Cotton was a different matter. I knew he would do it for the Gangstas, let them through a door at me." Russell thought he would be attacked in his cell, so he got out of his cell. He did not mean to kill Officer Cotton, only scare or injure him so that he would be moved to another unit. When he confronted Officer Cotton, Officer Cotton started to go upstairs toward the gang's area, and Russell believed that he was going to let gang members out to get him, so he stabbed Officer Cotton. Russell also felt that Officer Cotton was trying to pull a knife. At trial Russell told this story to his lawyers but they did not seem interested. He was confused when the trial court would not let him testify to this. He did not tell this story to the authorities because (1) they had been beating him and (2) he did not want to be a snitch.
¶ 13. Womber has also recanted his trial testimony by affidavit. He stated that he was beaten several times by security at Parchman after the stabbing. He was taken to Internal Affairs at Parchman at least twice a month from the date of the stabbing until the date of Russell's first trial in 1990. Internal Affairs told him what to say at trial or they would beat him and punish him in other ways. They told him not to say anything bad about Officer Cotton. He did not tell the truth at trial. Womber finally states that "[i]n 1993, I was no longer under any pressure or subject to any threats by MDOC personnel. If I was called as a witness at Willie Russell's trial in 1993, I would have testified to the truth of what I saw when Officer Cotton was killed and not what MDOC coached me to say." Womber neglected to provide any details on the truth he would tell, or how it differed from the version he told at trial in 1990.
¶ 14. Smith also recanted some of his testimony, but none of his statements are sworn. Smith's statement provided that Officer Cotton was talking with Russell when Officer Cotton hit Russell with a food tray and a big set of keys. He was beaten by guards after this and he testified according to what the authorities told him. He was threatened by some unknown state official the night before he *107 testified. For some unknown reason Smith stated that he does not "feel those kinds of pressures and fears now in relation to Willie Russell's case." Even under Smith's new version, Russell was out of his cell armed with a shank at the time of the stabbing.
¶ 15. Recanted testimony does not entitle a defendant to a new trial. A circuit judge must review all of the circumstances of the case, "including the testimony of the witnesses submitted on the motion for the new trial." We will not overturn a decision to grant or deny a motion for new trial based on recanted testimony unless the circuit judge abused his discretion. Bradley v. State, 214 So.2d 815, 817 (Miss.1968).
[T]o be persuaded by such [recantations] would be to place the control of the courts in the hands of corrupt witnesses who could by successive repudiations of their testimony cause the issue to oscillate at will, and make of perjury a basis for relief at the hands of the law which they had defied.
Bradley, 214 So.2d at 817. Recanted "testimony is exceedingly unreliable, and is regarded with suspicion; and it is the right and duty of the court to deny a new trial where it is not satisfied that such testimony is true." Id. The fact that a witness changes his testimony after the trial is not alone an adequate ground for granting a new trial. Peeples v. State, 218 So.2d 436, 438 (Miss.1969). See also Williams v. State, 669 So.2d 44, 53 (Miss.1996).

Russell's New Version of the Death of Officer Cotton
¶ 16. Russell has presented a new version facts surrounding Officer Cotton's death. According to Russell, Unit 24-B, where he was housed in Parchman in 1989, was a violent and dangerous place controlled largely by gangs and corrupt prison guards. The most powerful gang, and the one most important to Russell's story, were the GDs, led by an inmate named Eric "Schoolboy" Jones. Russell did not like gangs and did not belong to one. Russell stopped a GD attack on Theatry Branch, an inmate, one day in the yard at Parchman. For this reason the GDs planned vengeance against Russell rather than lose face in the prison population. The primary GD enforcer was an inmate named Ronald Pope. The GDs began to send threats to Russell orally and by letter and note. The GDs finally authorized the killing of Russell. The GDs tried to attack Russell during Russell's trip to the law library on July 17, 1989, but Russell refused to go and was disciplined by MDOC. Russell sought help from the prison authorities because of these threats but the MDOC authorities ignored Russell.
¶ 17. The GDs planned to kill Russell with the help of Officer Cotton, a corrupt officer who conspired and cooperated with inmates, including gang members and especially the GDs, to smuggle drugs and transfer counterfeit money orders for a percentage of the profit. Officer Cotton also would allow one inmate to attack another in exchange for money. Officer Cotton was carrying a knife on the day of his death in violation of MDOC rules. Officer Cotton was friendly with the GDs and with Smith, the inmate floorwalker at the time of Officer Cotton's stabbing. In return for money, Officer Cotton was going to take Russell out of his cell, handcuff him and leave him in a utility room where the GDs could kill him. Russell got his knife, or shank, long before July 18, 1989. He got the knife not to kill Officer Cotton, but to defend himself in the violent world of Parchman and specifically Unit 24-B. Russell never meant to kill Officer Cotton but only wanted to scare him with the shank, or injure him so that Russell would be *108 transferred to another unit away from the gangs.
¶ 18. Officer Cotton was the aggressor in the confrontation, hitting Russell first in the face with a meal tray. He also hit Russell with a set of keys. Russell did not intend to kill Officer Cotton as he stabbed Officer Cotton once and then stepped back, and did nothing further until Officer Cotton started hitting Russell with the meal trays. Once he was stabbed, Officer Cotton ran upstairs toward Zone 4, which housed numerous GDs, instead of toward safety in the guard's control tower, where Officer Lee was stationed.
¶ 19. Once Officer Cotton reached the safety of the control tower, after he had been stabbed twice, he still tried to cover up his involvement in the attempted killing of Russell. He called a Sergeant Clark, another corrupt MDOC officer, and said he was having trouble with Russell. Officer Cotton did not call the emergency number used at Parchman at this time. Officer Cotton delayed in calling until he realized the seriousness of his injuries.
¶ 20. Officer Lee was in the control tower at the time of the stabbing. Officer Lee left the tower once he saw the stabbing, hit Russell with his nightstick, which broke it off, and then ran back into the tower. Russell states that Officer Lee was much less heroic in reality than in the version of events that Officer Lee gave as a witness at trial.
¶ 21. After the stabbing of Officer Cotton, Russell and other inmates were beaten by MDOC officers in an attempt to intimidate them. Inmates were told not to tell investigators what had really happened. Smith, one of the State's witnesses against Russell at his 1990 trial, was a particular target.
¶ 22. The MDOC covered up the truth of what happened here because it feared civil liability on two fronts, one from Officer Cotton's family for the delay in getting him to the hospital, and from Russell for failure to protect him from gang violence. First, Russell states that he should not have been let out of his cell earlier on the date of the stabbing. Officer Cotton let inmates out of their cells based on his wishes and not on Parchman rules. Officer Lee was derelict in not monitoring the actions in the unit at the time of the stabbing.
¶ 23. The stabbing of Officer Cotton probably happened much earlier than reported in the official version of events. Officer Cotton was probably stabbed around 4:50 p.m. instead of 6:50 p.m. MDOC altered numerous reports in order to shield itself from liability for not getting Officer Cotton to a hospital in a timely fashion. The stabbing occurred during the feeding of the inmates, and the late meal at Parchman is served much earlier than in the outside world, so 4:50 is a more likely time than 6:50. There was a delay in getting an ambulance for Officer Cotton because he did not tell everyone he was stabbed when the other MDOC officers arrived at the control tower. The MDOC Hospital at Parchman was inadequate to deal with the stabbing, and Officer Cotton never should have been taken there before being taken to the Bolivar County Hospital.
¶ 24. The MDOC sought to cover up facts relating to Officer Cotton's death. No autopsy was performed. His wounds were not necessarily fatal, but were rendered so by the delay in getting him to the hospital. Another result of the failure to perform an autopsy was the failure to detect any substances, such as drugs or alcohol, which might have been in Officer Cotton's blood.
¶ 25. The MDOC or the prosecution failed to turn over exculpatory evidence *109 during discovery including statements or interviews or questionnaire forms filled out by inmates, re-wrote some interviews and did not preserve original notes, failed to turn over an interview of Officer Lee, and failed to interview or note the important role of GD enforcer Ronald Pope in this matter.
¶ 26. The chain of custody of the physical evidence in this case was non-existent. The shank allegedly used to stab Officer Cotton was not tested for blood or fingerprints. The prisoner jump suit worn by Russell during the stabbing was not introduced into evidence.
¶ 27. Internal Affairs put pressure on MDOC staff to re-write its reports to make them consistent. Administrative documents such as logs and registers were also doctored.

The Sources for Russell's New Version of the Facts
¶ 28. An affidavit is a sworn statement in writing made before an authorized official. Black's Law Dictionary 80 (4th ed.1968); see also Wilborn v. State, 394 So.2d 1355, 1359 (Miss.1981) (Patterson, C.J., dissenting). Russell attaches and relies on numerous statements which Russell refers to as "affidavits." Many of these "affidavits" have not been notarized as made before any official. We will refer to those as "unsworn statements." The Mississippi Uniform Post-Conviction Collateral Relief Act specifically requires "affidavits of the witnesses who will testify" be attached to the motion, or a showing of "good cause why they cannot be obtained." See Miss.Code Ann. § 99-39-9(1)(e) (Rev. 2000).
¶ 29. The crucial part of this new version is the evidence supporting the link between Officer Cotton and the GDs plot on Russell's life. Before trial and at trial there was evidence of Russell having trouble with gangs and there was evidence of Officer Cotton's corruption, but there was no link made between the two, so that Russell could argue that he was acting in self-defense because of an attempt on his life by the GDs, facilitated by Officer Cotton. Russell now supports this link with the affidavits of former or present inmates: Brian Berryman, Eric Jones, Everett Turner, Perry Williams, Theatry Branch, and Richard Boyington.

DISCUSSION
I. WHETHER THE CUMULATION OF ERROR IN THIS CASE RENDERS THE CONVICTION UNCONSTITUTIONALLY UNRELIABLE.
¶ 30. Russell states first that he "incorporates all of the issues below and asserts his right to a fair trial, free from the cumulative taint of each of the errors combined." He cites a number of cases from other jurisdictions on this matter, and finally cites the original opinion in this case, Russell, 607 So.2d at 1117 (quoting Hansen v. State, 592 So.2d 114, 142 (Miss. 1991)), where we stated, "It is true that no one of these errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is our view that they resulted in the appellant being denied a fair trial." We will review the issues raised in our usual fashion and, if we find grounds for relief, will grant such, regardless of whether the analysis is referred to as "cumulative error" or some other term.
II. WHETHER THE CUMULATION OF ERROR IN THIS CASE RENDERS THE SENTENCING VERDICT IN THIS CASE UNCONSTITUTIONALLY UNRELIABLE.
¶ 31. This issue is similar to Issue I, in that is a generalized statement which does not raise any particular issue for review.
*110 III. ALLEGED MISCONDUCT BY THE JURORS AT THE 1990 TRIAL.
A. WHETHER JURORS GAVE ACCURATE AND HONEST RESPONSES DURING VOIR DIRE.
¶ 32. Russell alleges that jurors failed to accurately and honestly answer critical questions during voir dire in the 1990 trial. Normally such an issue would be barred for failure to raise it on direct appeal. It appears that Russell is alleging that this issue is based on newly discovered evidence, or evidence that could not have been known at the time of trial.

James Percy Malone
¶ 33. Malone stated on his juror information card that his occupation was "retired." As for his former occupation, Malone stated on the card "policeman." At voir dire Malone stated, when defense counsel asked whether he had worked as an "employee of a law enforcement officer agency, whether it is State, Federal, prison or jail system, or some kind of correctional institute," that he was a police officer in Drew for about twenty-one years. Then some unknown juror stated, "I used to be a correctional officer," to which defense counsel replied, "I believe you had mentioned that and I appreciate that. I got that down here." The State argues that this was Malone. Russell argues that this was another member of the venire, one Gregory Marlow, who identified himself as a former employee of Parchman. A review of the record reveals that Russell is probably correct.
¶ 34. Russell attaches Malone's affidavit, which states, "I worked as a police officer for 20 years. Before that I worked at Parchman for one year and lived there with my family." The affidavit states nothing about what type of job Malone held at Parchman. Russell states that Malone worked as a guard. The State argues that Malone could have been doing something at Parchman besides being a guard. Neither side cites an employee verification notice from the MDOC, attached as an exhibit, which states that a Malone was a Correctional Officer I from March 11, 1974, to December 16, 1976. This information does not appear to agree with Malone's affidavit or his juror questionnaire or his testimony at trial, as this is longer than the one year Malone stated at trial. In addition, Malone stated in 1990 that he was retired, but did not say how long it had been since he had worked. Malone's juror questionnaire states that he was 67 years old in 1990. Before his retirement he was a police officer for approximately twenty years. Any job Malone held before that probably would have been sometime in the 1960s. If the employment verification notice does belong to Malone, then he must have worked for the MDOC at the same time he worked as a police officer.
¶ 35. We usually view such a question on direct appeal on denial of a motion for new trial, not some twelve years after trial. A recent example of this is our decision in Buckley v. State, 772 So.2d 1059 (Miss.2000), where Buckley alleged that a juror did not truthfully answer the question, "Are you or any member of your family, related to any police or law enforcement officer, Sheriff, or what have you?" Buckley alleged that he was entitled to a new trial because one juror failed to mention that her daughter was a dispatcher for the local police department one night a week. After the circuit court denied the motion for a new trial, we affirmed, stating that the test was the following: "(1) whether the question was relevant to the voir dire examination; (2) whether the question was unambiguous and (3) whether the juror had substantial knowledge of the information sought to be *111 elicited." Id. at 1064. If the answer to these questions is in the affirmative, then the circuit court should determine whether prejudice to the defendant can be presumed or inferred from the circumstances. We have stated that where a full and complete response would have provided a valid basis for challenge for cause, we will presume prejudice. Greater discretion is allowed if a correct response would have allowed for a peremptory challenge. Id. at 1063.
¶ 36. The voir dire question asked in this case was, "Have any of you ever worked as an employee of a Law Enforcement Office Agency, whether it is State, Federal, prison or jail system, or some kind of correctional institute?" The question was relevant, unambiguous, and Malone knew he had worked at Parchman for at least one year at sometime in the past. The dispute over whether Malone worked as a guard is irrelevant, as he worked in some capacity, and that is all the question asked.
¶ 37. Defense counsel attempted to have Malone stricken for cause and was unsuccessful. Even if defense counsel had known about Malone's employment at Parchman, he could not have had him stricken for cause, as defense counsel tried such a strike on Gregory Marlow and this was denied. As for peremptory challenges, defense counsel failed to challenge Mattie Lewis, whose brother was a guard at Parchman in 1990, so defense counsel's statement that they would have peremptorily stricken Malone if they had known of his employment history is questionable.
¶ 38. Russell also states that Malone had a "strong influence on the jury and its outcome." Russell's basis for this statement is the unsworn statement of Robert Pitts, who stated that one of the jurors, an ex-policeman, was very helpful on the jury. Taking into consideration all these circumstances, we find that the issue is without merit.

Other Jurors
¶ 39. Russell states that juror Dorothy Fulwood neglected to inform the court during voir dire that "our neighbor's daughter got shot dead about thirteen years ago. They said it was an accident, but nobody is sure." This is taken from an unsworn statement, and even if sworn, the statement is not particularly relevant.
¶ 40. Russell states that Herbert Hargett should have revealed his knowledge about the case (he had "probably read something in the newspapers about the case beforehand") and the fact that, at some unknown time in the past, when he was teaching, "he would take a class of kids up there [Parchman] for a tour." This is also taken from an unsworn statement and gives no reason to question the fairness of the jury selection process at issue.
B. WHETHER THE JURORS WERE COMPROMISED BY IMPROPER CONTACT WITH THE BAILIFFS.
¶ 41. Once again quoting from Herbert Hargett's unsworn statement, "the bailiffs were very helpful answering procedural questions that we had." Russell takes this to mean that the bailiffs answered questions relating to the case. Without further detail as to what a "procedural question" is, there is no error here.
IV. ALLEGED MISCONDUCT BY THE JURORS AT THE 1993 TRIAL.
A. ALLEGED EXTRANEOUS CONTACTS.
¶ 42. Russell cites an unsworn statement of juror Sarah Powell, dated May 22, 1997, which states that "the deputies who drove us would ask us how we *112 were thinking, which way we were leaning, when we were driving around." The statement does not say whether anyone on the jury ever answered such questions.
¶ 43. Russell also cites the unsworn statement of juror Glenn Ray, who stated that a "bailiff or somebody told us who the victim's family were in the courthouse." These allegations do not rise to the level of tainting the jury.
B. WHETHER THE JURORS WERE TAINTED BY KNOWLEDGE OF THE PRIOR IMPOSITION OF THE DEATH SENTENCE.
¶ 44. Russell once again cites only the unsworn statement of Sarah Powell. This is insufficient evidence to support such an allegation.
C. WHETHER ACCESS TO BIBLES TAINTED THE JURY.
¶ 45. Russell next argues that the jury improperly used the Bibles that were in their hotel rooms to help them make a decision. Russell once again cites the unsworn statement of Sarah Powell and cites Jones v. Kemp, 706 F.Supp. 1534 (N.D.Ga. 1989), and State v. Harrington, 627 S.W.2d 345 (Tenn.1981). A review of these cases shows that in each case a Bible was actually consulted during deliberations or Bible verses were read to the jury during deliberations. The situation in Russell's case is distinguishable.
D. FAILURE TO MAKE DISCLOSURES ON VOIR DIRE.
¶ 46. Russell finally argues that Sarah Powell did not reveal certain important facts during voir dire. Sarah Powell's statement, dated 1997, provides that "my son is a district attorney, this is his second year. He was at law school at Ole Miss. He had practiced under Judge Davis." If this is so, he would have begun his term in 1995 or 1996. Powell sat on the sentencing jury in 1993, so she could not have revealed it then. As for the allegation that Powell's son practiced under the trial judge, any assertion that defense counsel would have stricken Powell because of this is speculative.
V. ALLEGED DISCOVERY VIOLATIONS.
¶ 47. Under this section Russell only makes general allegations that the State withheld exculpatory materials from Russell during discovery. Russell argues that the State's obligation to turn over materials applies to all branches of the State and not just the District Attorney's Office. Russell allows that the items in question may not have been given to the District Attorney in the first place, but this would be no excuse. Russell's specific allegations are presented below.
A. ALLEGED SUPPRESSION OF EXCULPATORY EVIDENCE FROM EYEWITNESSES.

Internal Affairs Interviews
¶ 48. Russell alleges that "the Internal Affairs interviews of fourteen inmates who were in Unit 24-B that day, at least seven of whom had excellent views of what the State alleged occurred, were not turned over to the defense." Russell then gives a list of these inmates and states that several had a "particularly good view." Russell also cites the affidavits of his two defense counsel who stated that, when they turned their file over to Russell's current counsel, current counsel informed them that he did not have any investigation statements from eighteen inmates, and then lists their names. Russell alleges that "[v]arious of the witnesses whose Internal Affairs memos are missing confirm that they gave exculpatory statements to Internal Affairs. These include John Adams, Wendell Duncan, Charles Jenkins, Jessie Johnson, Dennis *113 Short, Reginald Sutton, Jeffery Vance, and Perry Williams."
¶ 49. (1) Reginald Sutton, an inmate. Sutton's affidavit gives some information about the GDs, and states that Officer Cotton dealt with the gangs as far as supplying money orders, food and cigarettes. Smith, the floorwalker who was assisting Officer Cotton at the time of the stabbing, was Officer Cotton's "middleman" in these dealings. Officer Cotton used the GDs as enforcers to help collect on debts from inmates.
¶ 50. (2) Dennis Short, an inmate. Short's statement contains general information about gangs, about the GDs specifically, and then states that Russell was never in a gang.
¶ 51. (3) Charles Jenkins, an inmate. Jenkins's affidavit states that gangs were plentiful and the gangs did not like Russell because he would not join and would interfere with their attacks on other inmates. "I saw the fight between Willie and Cotton from my cell. Cotton started throwing trays at Willie when he was going around the unit passing out trays for dinner. Willie was fighting back." Russell was beaten by guards after the stabbing, and the guards also locked down the inmates and tore their cells up.
¶ 52. (4) Grady Harris, an inmate. Harris provides details of dealing in money orders with the help of Officer Cotton. He was threatened by MDOC personnel before he testified at the 1990 sentencing hearing and told defense counsel about all of this and they did not do anything.
¶ 53. (5) Wendell Duncan, an inmate. Duncan speaks of his numerous illegal dealings with drugs and money orders in concert with Officer Cotton.
¶ 54. (6) Jeffrey Vance, an inmate. Vance states that the guards rifled through the cells, stripped inmates and beat them immediately after the stabbing.
¶ 55. Before trial in 1990 it was clear from the record that defense counsel was having difficulty getting all the inmate statements in question and had to repeatedly ask for them. It is difficult at this point to determine exactly what defense counsel finally received in 1990. It appears that certain inmate interviews, whether fourteen or eighteen in number, were never received by defense counsel in discovery.
¶ 56. We assume that the inmate statements or affidavits specifically cited here by Russell are the best he has at this point. As stated, only two, those of Reginald Sutton and Charles Jenkins, even qualify as affidavits. Sutton's affidavit talks about Officer Cotton's connection to the gangs and their illegal activities. Defense counsel attempted to introduce similar information into evidence at trial in 1990 but was not allowed to do so because no connection was made between Officer Cotton, the gangs, and a threat to Russell's safety. Jenkins gives his version of Officer Cotton's stabbing, saying that Officer Cotton started throwing trays at Russell, which means that Russell was out of his cell at the time of the confrontation, which comports with the State's version of the stabbing. Jenkins also mentions physical intimidation used against Russell and the other inmates after the stabbing. Russell already had mentioned that he was beaten by MDOC officers immediately after the stabbing in his statement to MHP Officer Rogers, which was suppressed before trial. Grady Harris gives a version of the stabbing, saying that Officer Cotton was yelling at Russell, baiting him, and started hitting him with food trays. Once again, if true, this means that Russell was improperly out of his cell. The State also cites Harris's testimony in the sentencing *114 phase at the 1990 trial, where Harris testified that "when I saw what happened, blood was already on his shirt. I didn't see the actual stabbing," but he did see Russell with a knife.

Alleged Destruction of Exculpatory Evidence
¶ 57. Russell cites a Response from the MDOC which states that, as of March 2001, all MDOC Penitentiary Internal Audit records prior to 1993 were purged in 1996 due to age and demand of storage space. Russell states that this raises an "additional presumption" that the documents in question were exculpatory. First, Russell cites no authority in support of this presumption. Second, it does not appear that any such presumption should arise on the basis of the material that Russell has cited on this issue, which is not exculpatory.
¶ 58. The State has the duty to preserve evidence, but that duty is limited to the evidence which "might be expected to play a significant role in the suspect's defense." Northup v. State, 793 So.2d 618, 623-24 (Miss.2001) (quoting California v. Trombetta, 467 U.S. 479, 488, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984)). When evidence is lost or destroyed, we use a two-part test to determine if a defendant is entitled to a new trial:
First, it must be determined whether the evidence would have played a significant role in the defendant's case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost. The second part of the test requires that the defendant have no way of obtaining comparable evidence by other means.
Northup, 793 So.2d at 623-24 (citations omitted). In Trombetta, the United States Supreme Court considered whether the government agents had acted in good faith and in accordance with normal practices, or whether a conscious effort was made to suppress the exculpatory evidence. 467 U.S. at 488, 104 S.Ct. at 2533, 81 L.Ed.2d at 422. The intentional spoliation or destruction of evidence raises a presumption, or, more properly, an inference, that the evidence would have been unfavorable to the case of the spoliator. Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent. Northup, 793 So.2d at 623-24 (citations omitted).
¶ 59. It is questionable as to whether the evidence at issue meets any of requirements stated above. Based on what Russell has supplied, the inmate statements are not particularly significant, but, if they were, a better source of comparable evidence has always been available, namely Russell. Russell has had numerous opportunities to tell the story on the record he asks us to believe his allegations concerning the gangs and the connection to Cotton and the murder plot on his life, and that he has never done it. Finally, it appears that the evidence was destroyed as a matter of routine, the office weeding material because of space consideration.
¶ 60. Russell states that "this evidence," meaning, apparently, the inmate statements and affidavits, strongly supported his version of events. He states that this evidence, and the evidence of Officer Cotton's involvement in the case against Russell, would have helped support the defense contention that Russell acted in self-defense. Russell raised self-defense at trial, apparently based on Russell's belief that Officer Cotton carried a knife and was attempting to pull it during *115 their confrontation, and the jury was instructed on that issue; it was not the self-defense theory that he attempts to rely on now.
B. WHETHER THE MDOC CONDUCTED A PATTERN OF INTIMIDATION SO THAT WITNESSES WOULD NOT COME FORWARD.
¶ 61. In addition to the numerous exculpatory inmate statements that Russell claims he never received, Russell also claims that the MDOC conducted a pattern of intimidation to keep other inmates from coming forward with helpful information. Russell cites two unsworn statements from Vance and Smith. Russell further cites affidavits from inmates John Michael Tiller, Alvin Luckett and James Robinson. Tiller saw nothing of the stabbing and only saw Officer Cotton being wheeled out on a stretcher after it was over. Luckett testified to Russell's gang troubles and Officer Cotton's illegal dealings, which was known by the defense at the time of trial, but nothing as to the stabbing. Robinson said he saw Officer Cotton attack Russell with meal trays. This did not contradict Russell's testimony that he was out of his cell with a shank at the time.
C. ALLEGED SUPPRESSION OF OTHER EXCULPATORY EVIDENCE.
¶ 62. Russell makes a general argument here that summarizes some of his previous arguments. The primary point of the argument is that the State suppressed evidence that would have supported his self-defense claim that Officer Cotton was going to allow the GDs to kill him. For Russell to have been acting in self-defense, he would have to have known about this plot himself. Though Russell did raise the issue of self-defense at his trial, he never raised this particular issue. He did attempt to introduce evidence of gang violence, but he never alleged that it was all part of a plot involving Officer Cotton and an attempt to kill him in revenge for interference in GD business. Russell could have told this story to MHP Officer Rogers or at trial but he did not do so. As to the argument that his reluctance to be truthful was the result of physical intimidation, Russell makes no credible argument as to why he would feel any safer now than in 1989 or 1990. It is difficult to see why MDOC officials would have wanted the version of the stabbing that Russell did tell made public any more than the version Russell is now espousing.
D. ALLEGED SUPPRESSION OF EVIDENCE OF AN INCONSISTENT PRIOR STATEMENT.
¶ 63. Russell states that "the State suppressed the inconsistent statements made by Smith and hid from the defense the fact that he was testifying only out of fear." Russell does not identify these inconsistent statements. Russell has attached two unsworn statements from Smith, which amount to an attempt to recant his trial testimony, but these statements did not exist at the time of either trial.
¶ 64. Russell next states that "the State did not disclose earlier statements made by various officers that were subsequently fashioned into the story that the MDOC wanted told at trial." Once again there is no specificity as to which statements, and no attempt to identify the officers.
E. ALLEGED SUPPRESSION OF EVIDENCE PERTAINING TO THE CREDIBILITY OF A STATE'S WITNESS.
¶ 65. Russell states that there was "substantial evidence that [Officer] Lee was drunk while he was on duty." Russell states that this evidence should have been available to him for impeachment purposes. Russell cites to an affidavit of *116 George Gowan, Exhibit KK. This exhibit shows a blank page with the notation "no such exhibit" on it.
F. ALLEGED SUPPRESSION OF THE STATE'S DEAL WITH AN INMATE/INFORMANT.
¶ 66. Russell argues that the State made some kind of deal with Smith, or Smith was "clearly expecting a benefit from his testimony," and Russell should have been informed about this. A review of Smith's unsworn statements reveals nothing about any expected benefit. What is stated is that Smith testified the way he did at the first trial because he feared for his life, as Russell argues under subpart B of this issue. Russell implies that Smith was rewarded for his testimony in 1990 with some kind of beneficial plea agreement in July of 1993, after Russell's second sentencing hearing in which Smith did not testify.
¶ 67. Russell also argues that there was ample impeachment material concerning Smith that should have been revealed. This is apparently the material brought up by Russell under Issue VIII. The issue is discussed in more detail there, but the impeachment Russell was deprived of, if any, does not appear to be significant. Even if Smith were impeached, his version of the stabbing was corroborated at trial by other witnesses and Russell.
G. ALLEGED SUPPRESSION OF EVIDENCE OF POLICE MISCONDUCT.
¶ 68. Under this issue Russell mentions the threatening of witnesses, the alteration of documents to show that the stabbing occurred earlier than reported in the official version, and the unnecessarily large number of MDOC officers present at trial. As for intimidation of witnesses, this was discussed in more detail above under Issue V, subpart B. As for alteration of documents, Russell argues that the stabbing of Officer Cotton happened an hour or two earlier than officially reported, so the MDOC was to blame for Officer Cotton's death because it did not get him to a hospital in a timely manner. Russell seems to be arguing that his criminal culpability should be less severe because of this alleged delay, but cites no authority to support this. He relies on the affidavit of inmate James Ball, who stated that it took a long time to get Officer Cotton any help; Officer Lee's first report stating that the stabbing occurred at 1645 hours, with help arriving at 1652 hours; Officer Lee's subsequent report stated that the stabbing occurred at 1852 hours, with help arriving at 1856 hours; Officer Lee's Use of Force Report states that the incident occurred at 1845 hours; the fact that the last meal of the day is not served after 6:00 p.m. in prison; that Correctional Officer James Bovan did not know the approximate time of the stabbing and refused to guess in his interview concerning the stabbing; that a portion of Officer Roy Horton's interview dealing with time was deleted with white out; Officer Rayford Jones started to give an earlier time for the stabbing and then corrected himself; and the Bolivar County Hospital Code Blue Record shows Officer Cotton was administered atropine at 6:00, before the stabbing allegedly occurred.
¶ 69. After reviewing these materials, we find the following: Ball's affidavit is too vague to mean much one way or the other; Officer Lee's conflicting reports could as easily be a typographical error as a coverup; we decline to take judicial notice about meal time in Parchman to judge whether the meal in question was being served late or not; a refusal to guess a time for the stabbing is not necessarily sinister; if any information on time was deleted from Roy Horton's interview, it was a time before the stabbing occurred; we will not speculate as to what Officer Jones was trying to *117 say except that he first was summoned to Cotton's aid at 17:54 hours, which does not fit the State's or Russell's scenario; and the Bolivar County Hospital's Code Blue Record does not say atropine was administered to Officer Cotton at 6:00, but at 8:10 and at 8:15. There is a notation "600" next to atropine, but it does not refer to time, as there is a similar notation of "3450" next to epinephrine.
¶ 70. Finally, as to the massive security presence in the courtroom, Russell was a prison inmate who had killed a guard and had previously escaped, or had attempted to, while at the University of Mississippi Medical Center in Jackson. Several of the witnesses were also prison inmates. If a trial ever merited a substantial security presence, this was it.
H. ALLEGED SUPPRESSION OR DESTRUCTION OF PHYSICAL EVIDENCE.
¶ 71. Russell next argues that the State suppressed physical evidence because no autopsy was performed on Officer Cotton. An autopsy is not required by law in a murder case in this state. See Evans v. State, 725 So.2d 613, 657-58 (Miss.1997) (construing statutes listing officials who could request or authorize autopsy). Russell did not raise this issue as part of an insufficient evidence claim on direct appeal. Russell's arguments about what might have been found if an autopsy had been done on Officer Cotton are speculation.
¶ 72. Russell next states that "the shank that was alleged to have been used in the crime had no blood on it, but was not produced for trial." The shank which allegedly killed Officer Cotton was introduced by the State at trial.
¶ 73. Russell next argues that "the clothes that [he] was wearing that were supposed to have been drenched in blood were not produced for trial, even though this would have helped the defense show that there was only blood on the legs." It is not clear as to whether Russell is arguing that the clothes were not produced in discovery or were not introduced at trial by the State. At trial defense counsel objected when the State attempted to introduce the shirt Officer Cotton was wearing when he was stabbed, and the circuit court sustained defense counsel's objection. At that point, defense counsel stated: "Your Honor, before we bring the jury back in, if she intends to introduce the prison outfit that Willie Russell had on to exhibit the blood, we might as well take that up now." The State answered: "I don't intend to introduce that." Russell may not now complain about the failure to introduce his bloody clothes, since his trial counsel was ready to object to it being introduced.
I. ALLEGED PERJURED TESTIMONY.
¶ 74. Russell once again refers to Smith's testimony, which Russell alleges was false and procured by threats or bribes of leniency from the State, depending on which of Russell's issues is being considered. Once again, Russell's only has Smith's unsworn statements in support of this recantation. This issue is without merit.
J. ALLEGED SUPPRESSION OF OTHER EXCULPATORY EVIDENCE.
¶ 75. Russell does not refer to any specific evidence here. If this is an issue, it is without merit.
VI. WHETHER THERE WAS A REASONABLE PROBABILITY THAT, BUT FOR THE SUPPRESSION OF EXCULPATORY EVIDENCE, THE OUTCOME OF THE *118 TRIAL WOULD HAVE BEEN DIFFERENT.
¶ 76. Russell makes this argument as a kind of general statement, supported by case law but absent any specifics.
VII. WHETHER THERE WAS A REASONABLE PROBABILITY THAT, BUT FOR THE SUPPRESSION OF EXCULPATORY EVIDENCE, THE OUTCOME OF THE PENALTY PHASE WOULD HAVE BEEN DIFFERENT.
¶ 77. This statement is made as a general conclusion without specifics.
VIII. WHETHER THE INTRODUCTION OF THE TRANSCRIPT OF SMITH'S TESTIMONY AT THE 1990 TRIAL PREJUDICED RUSSELL AT THE 1993 TRIAL.
A. WHETHER THE ALLEGED SUPPRESSION OF EVIDENCE RENDERED COUNSEL CONSTITUTIONALLY INEFFECTIVE.
¶ 78. Smith was serving time in Parchman for burglary on July 18, 1989. He was a floorwalker that day, describing his duties as cleaning floors and passing out food trays. He stated that Officer Cotton had asked him to pass out food trays in Zones 2 and 3. He said that he started passing the trays over and looked around and saw Officer Cotton and an inmate "involved in an incident." Smith stated that he had already passed out trays in Zone 2 and was in Zone 3 and that Officer Cotton was trying to lock the door between Zone 2 and 3 at the time of the attack. He "felt glass come past me" and he then looked around and saw Russell stabbing Officer Cotton in the back with a knife.
¶ 79. Smith's testimony is confusing, but he stated that Officer Cotton and Russell fought, went up some stairs and fought again, where Russell stabbed Officer Cotton again, this time in the chest. Officer Lee came to Officer Cotton's aid and hit Russell with a nightstick, while Officer Cotton ran into the guard tower. Smith did not know where Russell came from before the stabbing.
¶ 80. The State wanted to produce Smith's testimony at Russell's second sentencing hearing but claimed that he was unavailable. The State sought to introduce Smith's testimony through transcript of his testimony in the first trial. Over the defense's objection, the testimony was introduced. On direct appeal defense counsel argued that the State had not sufficiently shown that Smith was unavailable. We found this issue to be without merit. See Russell, 670 So.2d at 827-29.
¶ 81. Russell argues first that defense counsel should have impeached Smith with a letter Smith wrote to Officer Cotton's mother. It appears that the letter is undated, and we will assume that defense counsel had access to the letter before the 1990 trial, since no one makes a contrary argument. Russell states that Smith's letter says the KKK was behind Officer Cotton's death, and he could have been impeached with this inconsistency. We have attempted to read the letter in question. It is a poor copy and nearly illegible. Even if the letter says this it seems to amount to meager impeachment, and no one suggests that Russell did not stab Officer Cotton.
¶ 82. Russell next mentions a letter that Smith wrote to Warden Booker. It is not clear whether Russell is alleging that defense counsel had or should have had this letter at the time of trial or not. Once again the letter is nearly illegible. Smith seems to be trying to say that he knows how some officer was killed and how the inmate got out of his cell and how he got the weapon, but details are not given.
*119 ¶ 83. Russell next states that defense counsel did not attempt to impeach Smith with Smith's internal affairs interview. Defense counsel did ask Smith at trial that if Smith told internal affairs that Russell just lost control during the attack, "is that probably correct." Smith said yes. Defense counsel asked Smith about another part of the interview where Smith said that Russell was only intending or trying to scratch Officer Cotton. Smith said that was correct. Russell does not say how else defense counsel should have tried to impeach with this particular item.
¶ 84. Russell is correct that Smith mentioned glass coming past him during his testimony and defense counsel failed to ask him about this. Whether this glass had any relevance to this case is speculation.
¶ 85. Russell next argues that Smith could have been impeached by his testimony on the number of times Officer Cotton was stabbed. Since the number of times Officer Cotton was stabbed is known, showing Smith was incorrect on this appears to be of little value.
¶ 86. Russell next argues that Officer Lee said he did not see Smith in Zone 3 while Smith said he was there during the stabbing. A review of the interview Russell refers to shows that Officer Lee said he did not see Smith in Zone 3. Once again this would have been marginal impeachment.
¶ 87. Russell next argues that Officer Nathan Allen said that when he came into the building after the stabbing, Smith was locked up. Officer Allen's interview with investigators does say this. This is marginal impeachment.
B. ALLEGED PERJURED TESTIMONY.
¶ 88. Russell next argues that Smith told a "pack of lies" at Russell's first trial. Russell's authority for this assertion is Smith's unsworn statements attached as Exhibits NN and SS to this Petition. In this "affidavit," Smith states that Officer Cotton hit Russell with a food tray and a big set of keys and was trying to force Russell into Zone 4, where the GDs were waiting for him; that this gang was after Russell because he had interfered in their business; that guards or someone beat Smith and forced him to testify as he did in 1990, and that testimony was false; he wanted to tell the truth at the second sentencing hearing in 1993 because he was not under any of the "heavy pressures" that he was under in 1990. This statement somewhat follows Russell's new version of the stabbing, but it is not an affidavit and, pursuant to statutory requirements, we give it no credence. Furthermore, because Smith would have been subject to withering cross-examination concerning his general criminal background and lack of proof to support his changed story that he was beat up, in connection with the lack of any sworn affidavit, Smith's story would be very easily impeached.
C. WHETHER SMITH WAS TRULY UNAVAILABLE TO TESTIFY AT THE 1993 TRIAL.
¶ 89. At Russell's second sentencing trial on March 2, 1993, the State argued that Smith was not available, and therefore it should be able to introduce his transcript from the first trial into evidence. Sandy Sanders, an employee of the District Attorney's Office, testified that she began issuing subpoenas in January 1993 for witnesses in this case. She issued a subpoena to Parchman, then found out Smith had been transferred to the correctional facility in Greene County. She issued a subpoena there, only to find that Smith had been released on July 10, 1992. *120 There were apparently no restrictions on Smith's release. Sanders was told Smith got on a bus for Jackson, so she contacted the Hinds County Sheriff's Office, which was unable to locate him.
¶ 90. There is no dispute that Smith was actually in the Yazoo County Jail on September 28, 1992, after his arrest on forgery charges, and that he remained there until April 6, 1993, when he pled guilty to two counts of forgery. Smith received five years on one forgery count, with 4½ years suspended and six months to serve, which he had already served by that time. Smith was sentenced to complete the Restitution Program on the other count.
¶ 91. He was released on April 6, 1993, failed to report to the Restitution Program, stole a one-ton truck on May 28, 1993, and was arrested and placed in the Yazoo County Jail on May 31. His suspended sentence was revoked on June 24, 1993, and a hold was placed on Smith in Yazoo County for the MDOC at that time. Smith pled guilty to one count of grand larceny in July 1993 and received a four year sentence with one year suspended.
¶ 92. Russell first argues that defense counsel was ineffective for failure to determine Smith's whereabouts prior to the second trial. There is no way to determine now why defense counsel did not find Smith. However, it is evident that Smith's reliability as a witness would be questionable at best due to a number of factors and the lack of an authenticated affidavit which would cast further doubt on what his testimony would be.
¶ 93. Russell then argues that since the same assistant district attorney prosecuted Russell in March 1993 and Smith at his guilty plea hearing four months later, the State knew where Smith was in March 1993 and lied to the court about his availability. According to Russell, the State's motive to keep Smith off the stand at the second sentencing trial was the knowledge that he would testify truthfully the second time. Russell also implies that the dismissal of a burglary charge against Smith in July 1993 was a reward of some kind for some earlier testimony.
¶ 94. The State answers that Smith flat-timed his sentence and was released without restriction in July 1992, and the State would have no reason to know of Smith's whereabouts until he was sentenced to their custody in April 1993.
¶ 95. Russell states that "at the time of the second trial, it is clear that the State would not have got the same testimony from Mr. Smith, and the story that the jury heard would have been very different." Once again there is no authority for this except Smith's unsworn statement. If Smith testified in fear of his life at Russell's first trial because of threats from MDOC personnel, there is no reason to believe that these threats would not have been as viable in 1993 when Smith was still in custody. While Smith was available at the second trial, there is no credible evidence that his testimony would have been different, that the defense would have been able to do a better job of impeaching him, or that the State's failure to find him was part of some deliberate plot. We find that this issue to be without merit.
IX. ALLEGED CONFLICT OF INTEREST ON THE PART OF DEFENSE COUNSEL.
A. WHETHER DEFENSE COUNSEL VIOLATED THE ATTORNEY-CLIENT PRIVILEGE.
¶ 96. Russell argues that by agreeing to have an MDOC security officer present with Russell and defense counsel after Russell took an overdose of pills, defense counsel violated Russell's attorney-client privilege. MDOC Officer Radford *121 stated to defense counsel that Russell could present a security risk to defense counsel and others. Officer Radford suggested to defense counsel that he, Radford, be present during conferences between defense counsel and Russell. Defense counsel agreed on the trial court's assurance that nothing stated by defense counsel to Russell or vice versa would be repeated.
¶ 97. Russell now argues that this was a per se violation of his attorney-client privilege, for which no actual disclosure of confidential information or showing of prejudice was necessary. Defense counsel stated in an affidavit that it was not their idea to have security in these conferences, though they agreed to it at the time. Russell argues that he never did anything to justify this security measure, and it was a result of defense counsel's inexperience and failure to build a relationship of trust. He states that he could not speak freely to his attorneys at this point, and that defense counsel could not properly prepare Russell for his testimony. They had a conflict of interest on this issue because they might have been liable for sanctions from the Bar for this action. Russell argues that even if security was necessary, alternative means were available.
¶ 98. Russell cites numerous cases on this subject, but none have a similar fact situation to that of Russell's in this case. Russell never alleges that any confidential communication was revealed by Officer Radford to the State and used against him. Russell only states that he could not speak freely in front of Officer Radford, but this security measure was first implemented on the day Russell testified. Defense counsel stated on the record that they had talked to Russell off and on for several months previously about whether he would testify. Russell does not say what was left unsaid in the one thirty to forty minute conference, presumably with Officer Radford present, on the lunch break before Russell took the witness stand. The circuit court stated that these communications were confidential, and if any breach had occurred, then there would certainly be a violation of Russell's rights, but we are unaware of any authority supporting a presumption of a breach or a violation of Russell's right. Russell also alleges that less intrusive security measures were available, but does not elaborate. We find that this issue is without merit.
B. WHETHER THE CIRCUIT COURT'S ORDER PERTAINING TO RUSSELL'S TESTIMONY PREJUDICED HIS DEFENSE.
¶ 99. Russell alleges that defense counsel "acquiesced" in a requirement that Russell be forced to commit perjury on the stand. Defense counsel unsuccessfully tried to introduce evidence concerning Officer Cotton's illegal dealings with inmates and gang threats against Russell. Russell then took the witness stand and testified in accordance with the trial judge's rulings. Defense counsel alleged on direct appeal that these rulings were erroneous. We found the issues to be without merit. See Russell, 607 So.2d at 1113-16.
¶ 100. Though Russell argued that he should have been able to introduce evidence concerning Officer Cotton's dealings and gang threats, neither he nor defense counsel ever connected these factors at the first trial to say that in combination, these factors amounted to a threat on his life. The State argues that this is merely a backhanded way of trying to raise an issue that has already been decided. We agree. Where a defendant tries to introduce evidence, fails, and then testifies in accordance with the trial court's evidentiary rulings, this is not perjury and is not ineffective assistance of counsel. This issue is barred by res judicata under Miss. Code Ann. § 99-39-21(3) (Rev.2000).
*122 X. ASSISTANCE OF COUNSEL DURING THE GUILT PHASE.
A. WHETHER COUNSEL WAS RENDERED UNCONSTITUTIONALLY INEFFECTIVE DUE TO CUMULATIVE ERRORS.
¶ 101. Russell argues that he received ineffective assistance of counsel during the guilt phase, and that we must review the totality of the circumstances and the cumulative effect of counsel's lapses. Russell cites, along with Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Ninth Circuit and Texas opinions in Harris ex rel. Ramseyer v. Wood, 64 F.3d 1432 (9th Cir.1995); Wenzy v. State, 855 S.W.2d 52 (Tex.Ct. App.1993); and Ex parte Welborn, 785 S.W.2d 391 (Tex.Crim.App.1990). The State answers that "some errors will have isolated effect and others may be pervasive," and the test Russell suggests is "simply wrong."
¶ 102. The proper standard for determining if counsel was constitutionally ineffective is as follows:
In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial. "Judicial scrutiny of counsel's performance [is] highly deferential." There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that but for the attorney's errors, the outcome of the trial would have been different, will we find that counsel's performance was deficient.
Holly v. State, 716 So.2d 979, 989 (Miss. 1998) (citations omitted).
B. WHETHER DEFENSE COUNSEL WERE QUALIFIED TO TRY A CAPITAL CASE.
¶ 103. Russell states that both defense counsel were trying their first capital case when defending Russell, and therefore there is a "presumption of prejudice." Russell cites Copas v. Comm'r of Correction, 234 Conn. 139, 662 A.2d 718 (1995); Rose v. State, 675 So.2d 567 (Fla. 1996); Commonwealth v. Perry, 537 Pa. 385, 644 A.2d 705 (1994). None of these cases stand for the proposition that counsel can be presumed ineffective because of lack of experience in trying a particular kind of case. The charge of ineffective assistance of counsel must be tested against established legal precedent set out in Issue X.A., supra. This issue is without merit.
C. FAILURE TO DEVELOP A MEANINGFUL RELATIONSHIP WITH RUSSELL AND TO ESTABLISH SUFFICIENT TRUST.
¶ 104. We will not presume to determine whether defense counsel's relationship with Russell was meaningful or not. We cannot know whether Russell told defense counsel everything he should have told them, but this course of action is finally in the hands of Russell. Russell is raising once again the issue of violation of privilege previously discussed under IX.A., and for that reason this issue is also without merit.
D. FAILURE TO SECURE ADEQUATE FUNDS FOR THE INVESTIGATION.
¶ 105. Russell argues that his defense counsel should have secured adequate funds to investigate his case. Russell cites the affidavits of defense counsel, which both state: "The degree of funding *123 in capital cases in my district was very limited in 1990." Russell then apparently acknowledges that the lack of investigative funds "is in large part attributable to the lack of funding in the district at the time." Russell next says that defense counsel spent "only approximately twenty hours total on the investigation for both phases of this criminal trial." Russell gives no source for this allegation. Russell next alleges that what investigation defense counsel did was inadequate and incompetently done, but once again this allegation has no source. Absent more detailed evidence as to what was available in the district in question versus what defense counsel actually requested or got in expert funds, we find this issue without merit.
E. FAILURE TO SECURE ADEQUATE FUNDS FOR EXPERTS.
¶ 106. Russell states that "the Mississippi Supreme Court has held that, upon a proper showing of need, the defense is entitled to all experts reasonably necessary for an effective defense." Russell cites Johnson v. State, 529 So.2d 577 (Miss.1988), where we found no error in the trial court's denial of funds for a fingerprint expert to challenge the State's fingerprint evidence.

Expert Pathologist
¶ 107. Russell points out once again that there was no autopsy performed on the victim in this case. This omission has already been discussed in this opinion. Russell cites to an affidavit from Dr. Stephen Hayne, which is not included in the exhibits volume. A blank page containing the statement "forthcoming as soon as practicable" is attached.

Expert on Prison Administration
¶ 108. Russell argues that Donald Cabana would have been an impressive witness for the defense. Russell cites to an affidavit of Cabana which is not included in the exhibits volume. A blank page containing the statement "he is sick, and we will provide it as soon as practicable" is attached.
F. FAILURE TO BE SUFFICIENTLY FAMILIAR WITH THE LAW ON CAPITAL CASES.
¶ 109. Russell states that defense counsel was ineffective for failure to object to the State's instruction on self-defense. Russell further argues that defense counsel was ineffective for failure to have the jury instructed on the new theory of self-defense Russell is now attempting to raise, and failure to mention this theory on closing argument.
¶ 110. Russell states that defense counsel was ineffective for failure to object to State's Instruction S-3. The State admits that S-3, given alone, was determined by this Court to be an incomplete instruction on the law of self-defense in Reddix v. State, 731 So.2d 591 (Miss.1999), because it did not instruct the jury to acquit the defendant if the jury found that he was acting in self defense. The State also argues that in 1990, the time of Russell's trial, the giving of S-3 alone was not improper, and therefore defense counsel could not be seen as ineffective for failure to object or submit an additional instruction to complete Instruction S-3. We agree.
¶ 111. Russell also argues that defense counsel should have argued Russell's new theory of self-defense on closing argument and should have requested an instruction on it. As stated, no one, including Russell, testified in support of this new theory at the 1990 trial. Therefore, an instruction based on this new theory would not have been justified.
G. FAILURE TO INVESTIGATE ADEQUATELY.
*124 ¶ 112. Russell states generally that defense counsel has a duty to investigate and prepare, particularly where it involves investigation of a potential defense. We agree with this general statement.

Self-Defense Theory
¶ 113. Russell argues that defense counsel failed to investigate the "obvious" defense that Russell acted in self-defense. Russell states that defense counsel should have sought to interview all inmates in Unit 24-B, stating that this should have been the "starting point" of the investigation. Russell then states that Donald Cabana's expert testimony should have been secured. Russell states that defense counsel never made the link between the gang threats and the involvement of Officer Cotton despite Russell including it in his statement to MHP Officer Rogers.
¶ 114. We disagree. The starting point of the investigation should have been Russell telling defense counsel or someone else that he killed Officer Cotton because Officer Cotton was going to help the gangs kill him. Neither affidavit submitted by defense counsel states that Russell informed them of this link. Both affidavits state that (1) Russell had gotten in trouble with the gangs at prison because he stopped a gang attack on a third inmate; (2) Russell had written to the authorities to inform of the gang threats against him and (3) Officer Cotton engaged in illegal activities with inmates, including taking $20.00 from Russell and not giving him the yeast or money back. Russell attaches nothing from Donald Cabana as to whether he would have testified. A review of Russell's statement to MHP Officer Rogers shows that Russell stated that he killed Officer Cotton because of the refusal to return his money/yeast, and as an unrelated matter, Russell was having trouble with gangs. No link or relation between the subjects was made. Finally, Russell made no such link in his trial testimony.

Lack of Intent to Kill Theory
¶ 115. Russell argues that defense counsel should have investigated the possibility that the stabbing of Officer Cotton was an accident, or at least that Russell had no intent to kill him. First, defense counsel may have investigated this defense and found little or nothing to support it. Russell cites his own testimony at trial where he stated that he "was intending to scare him with the knife. I didn't mean to stick him or nothing * * * It just surprised me, caught me by surprise that I had stabbed him. I really didn't mean to stab him...." The jury heard this evidence and was not convinced that it was unintentional, not surprising considering that Russell stabbed Officer Cotton more than once. As for Russell's argument that he was only trying to "scratch up and catch out," or wound Officer Cotton so he could be transferred out of Unit 24-B, this argument was connected to the self-defense/gang scenario, which, once again, Russell never testified to. Finally, Russell once again makes the argument that he was not responsible for Officer Cotton's death because the delay in getting him to the hospital killed him, not the stabbing. Once again Russell cites no authority in support of this.

Failure to Secure Certain Witnesses
¶ 116. Russell argues that defense counsel failed to investigate certain unnamed witnesses, and review materials that would have shown "the manner in which the prison operated, the reasonableness of Russell's fear of the gangs, his reasonable understanding that a guard had to be facilitating the attack on him, and the manner in which the MDOC sought to sanitize and alter the facts of the case." *125 The manner in which the prison operated was made plain at trial. As for Russell's fear and understanding concerning gangs and guards, he failed to inform the court and jury of this when he testified. Russell's allegation of sanitized facts is far from conclusive.

Failure to Discover Impeachment Evidence
¶ 117. Russell argues that "[t]here was a large amount of evidence that was available to impeach the State's witnesses, yet defense counsel failed to investigate and find this evidence, let alone use it at trial." Russell specifically states that defense counsel should have impeached Smith with Russell's statement to MHP Officer Rogers concerning Smith's connection to Officer Cotton. Russell also states that defense counsel should have impeached Smith with his letter stating his "bizarre" view that Officer Cotton's stabbing was related to the KKK. This may have been helpful except that Smith's version of the stabbing varied little from the version provided by Russell in his trial testimony, and Russell now asks us to find Smith a credible witness pursuant to his recantation of his trial testimony found in his unsworn statements.
¶ 118. Russell also makes the same general statements about Christopher Womber and Officer Lee but suggests no specific impeachment evidence. Since it appears that Womber has also partially recanted his trial testimony via affidavit, we must also now find him credible, according to Russell.
H. INADEQUATE COMPETENCY EXAMINATION AND HEARING.
¶ 119. Russell states that he was incompetent and defense counsel was ineffective for failure to properly deal with this issue. Russell cites as evidence of this an overdose of some kind of medication Russell took during trial. On October 4, 1990, before any testimony was given on that day, Russell told the circuit judge that he had taken "something like an overdose of medication and it has gotten me very drowsy." Russell said he had taken nineteen of some kind of pill the night before, he had been to the hospital that morning and the doctor said he "was all right this morning." The circuit judge questioned Officer Radford, who was responsible for moving Russell to and from the court. Officer Radford gave a summary of what the doctors who had examined Russell had done and found. The circuit court then informed Russell that the trial would proceed. After the noon recess, Russell took the stand in his defense. The next day the circuit court stated as to the Russell's conduct the previous day that he had "stayed awake throughout the trial and appeared to be coherent and able to assist in the same degree that he had assisted at all other times and was certainly responsive to questions while he was on the stand." Defense counsel Stuckey stated that Russell was drowsy in the morning on the day in question but later in the day they had a thorough discussion of Russell's decision to testify.
¶ 120. Russell states that defense counsel should have spoken for Russell, instead of having him speak; they should not have taken the word of Officer Radford as to what the doctors who examined Russell after the overdose had found; other doctors who had examined him had found some inclination for suicide; and Russell was under pressure and was depressed at the time.
¶ 121. Russell quotes both Dr. Gilbert McVaugh, a psychologist, and Dr. Charlton Stanley, a psychologist, as to comments made on Russell's suicide risk. The significance of these findings or comments is questionable, as both Dr. McVaugh and *126 Dr. Stanley found Russell competent to stand trial.
¶ 122. Russell argues that defense counsel should have secured the assistance of an independent expert to determine Russell's state of mind. It is not clear whether Russell is referring to the day after he took the overdose or before the trial in general. While the circuit court could actually have consulted with the medical personnel that treated Russell after his overdose, or at least postponed Russell's testimony until the next day, in light of the record made of the events of that day, we cannot say defense counsel was ineffective for failing to demand some additional competency examination during the trial.
¶ 123. Russell cites Bouchillon v. Collins, 907 F.2d 589 (5th Cir.1990), where defense counsel allowed Bouchillon to plead guilty without having him examined by any kind of mental health professional even though he knew that Bouchillon was a combat veteran with a long history of mental problems and substance abuse. Russell's case can be distinguished on its facts. Russell was examined and declared competent before his trial. This issue is without merit.
I. FAILURE TO PRESENT PRE-TRIAL MOTIONS.
¶ 124. Russell makes a general argument that defense counsel failed to "prepare, file and present various motions that were critical to the defense." As for specific motions, Russell states that this is the "subject of greater discussion below."

Failure to Secure an Adequate Record
¶ 125. Russell argues that "time after time" on voir dire defense counsel failed to make sure that the appeal record was clear as to the juror being questioned. Russell argues that because defense counsel failed to do this, "any number of issues that might otherwise have been raised with respect to these jurors" could not be raised. This argument is too speculative for consideration.

Failure to Obtain Certain Discovery
¶ 126. Russell next argues that defense counsel was ineffective in discovery for failure to follow up the State's failure to provide all of the inmate Internal Affairs interviews. Russell states that defense counsel should have called witnesses to show where the interviews might be, or should have presented evidence in this regard, or should have called the law enforcement officials who took the statements, or should have investigated and interviewed the witnesses whose statements were missing.
¶ 127. The record shows that defense counsel first began raising questions about inmate interviews in the preliminary hearing in April of 1990. At a subsequent hearing that month, defense counsel stated as follows:
"At the preliminary hearing, it became apparent or at least our understanding that a number of inmates at Unit 24-B where this incident occurred had been interviewed by various investigators of the State and, that certain statements may have been taken from some, if not all of them, and that certain documents referred to as questionnaires, I believe had been filled out by some of these inmates, if not all of them, signed by them. We have been furnished none of those if such exist." The trial judge stated that defense counsel should make a specific request in writing to the district attorney, and in absence of compliance, defense counsel could follow up with a motion.
¶ 128. On May 30, 1990, defense counsel filed a supplemental request for the production of documents, asking for copies *127 of all questionnaire forms signed by inmates of what they saw or heard of the stabbing; statements of inmates; a list of inmates in Unit 24-B and their cell numbers on July 18, 1989; a copy of the pass-on log for Unit 24-B on July 18, 1989; copies of tapes of interviews with Russell, not limited to the one conducted by Charles Rogers; the personnel file of Officer Cotton; copies of investigation reports concerning money order schemes in which Cotton is mentioned; copies of disciplinary action taken against Cotton; and a copies of personnel files of Russell.
¶ 129. On the same day, defense counsel also requested all evidence from the District Attorney, Office of Internal Affairs of Parchman or MDOC or the Highway Patrol; and Sunflower County Sheriff's Office pertaining to this case.
¶ 130. At a hearing the next day, defense counsel continued to ask for inmate questionnaires, stating that it had gotten some of them but not all. Defense counsel also noted that there were apparently two separate investigations done, one by Internal Affairs and one by Charles Rogers and the Highway Patrol, and defense counsel asked to see both files. Defense counsel then repeated the request for investigative files and inmate questionnaires or interviews. The circuit court stated that could be taken up on June 6.
¶ 131. At that hearing, defense counsel stated that there were approximately sixty inmates housed in the applicable area at the time of the stabbing, and defense counsel had received forty-five questionnaires. Defense counsel asked about these missing questionnaires and if there were any other materials that had not been turned over or had been disposed of. Sharon McFadden, an Internal Affairs officer, was questioned about the missing questionnaires and any additional interviews. McFadden stated that most of the missing questionnaires appeared to be from one officer, Office Jones, and she would check with him. There is nothing else in the record on this matter.
¶ 132. We find that defense counsel made more than a satisfactory effort to obtain the evidence in question. Particularly where defense counsel had access to the most important witness to the stabbing, it does not appear that Russell suffered prejudice here.

Failure to Move for a Change of Venue at the 1990 Trial
¶ 133. Russell alleges that defense counsel was ineffective for failure to move to have venue for his first trial changed. Russell argues that any Sunflower County jury would be overwhelmingly prejudiced against Russell because a large number of the Parchman employees are residents of Sunflower County; these Parchman employees would have formed opinions about Russell; and that Parchman has a substantial economic impact on Sunflower County. All this, along with unfavorable publicity, combined to make the 1990 jury an unfair one.
¶ 134. Russell also cites our cases on change of venue, and states that if such a motion had been made in 1990 it would have been granted. We recognize that motions for change of venue are often made and granted in capital cases.
¶ 135. Even if one assumes that failure to request a change of venue in 1990 amounted to deficient conduct on behalf of defense counsel, there is still the matter of prejudice. Russell did request and receive a change of venue in 1993, and was still sentenced to death in his second sentencing hearing. Russell, under the facts of his case, would have had a difficult task in any county. There are strategic reasons why counsel might have wanted to keep the trial in Sunflower County, including *128 the difficulties inherent in trying a case a long distance from home and fear that the county to which the case might have been moved might be more conservative than Sunflower County. Large employers with economic clout who also house dangerous criminals in close proximity to county residents can engender resentment as well as devotion from those residents. We cannot say that defense counsel was ineffective for failure to request a change of venue in 1990.

Inadequate Voir Dire
¶ 136. Russell next argues that defense counsel failed to "litigate effectively to secure adequate voir dire conditions." We assume that Russell means that defense counsel failed to convince the trial judge to allow individualized, sequestered voir dire. Defense counsel filed a motion for individualized sequestered voir dire on May 30, 1990. The motion was denied by the trial court, which stated that it would grant "the right to have a smaller panel than the entire panel...." After a general voir dire was completed the court began voir dire dealing strictly with death penalty questions in panels of twelve. After this proceeded for some time defense counsel asked that the panels be reduced to six jurors. The trial court refused. The issue was raised on direct appeal and rejected by this Court. See Russell, 607 So.2d at 1110. Defense counsel was not ineffective here.

Failure to Object to the Security at Trial
¶ 137. Russell states that defense counsel failed to do something about the "massive security presence" in the courtroom at the 1990 trial, and further alleges that "officers who were witnesses wore their uniforms to court, clearly identifying their affiliation with the threatening mass of their cohorts in the audience." Russell cites the testimony of Christopher Womber, (which has now been recanted), where Womber, in attempting to show the distance from his cell to another point, stated "I could see about where that officer is over there" and on another page, "about as far as from me to where that sheriff is sitting there," and on another page, "Naw, like that guy setting back there. That's help with that fatigue onwhen they dial that number, them guys will come and some guys in black will come." Russell also cites the unsworn statement of Grady Harris, an inmate witness, and the affidavit of Russell's aunt, Louise Robinson, who stated that she had never been to a trial before, but she was scared by the presence of so many armed guards. What Robinson did not say was that she testified any differently because of the presence of the guards.
¶ 138. From this limited record we cannot determine what size the security presence at the 1990 trial was, but it would be surprising if it was not large. Russell was on trial for killing an MDOC corrections officer and was already incarcerated on an armed robbery conviction. In addition, Russell had allegedly, while being treated at UMMC Medical Center in 1987, overpowered a guard, taken his pistol, and escaped with another guard as hostage. The escape attempt ended with Russell's capture after an exchange of gunfire. Several Parchman inmates were also witnesses at the trial. We find that this issue is without merit.

Failure to Secure Russell's Presence in the Courtroom Without Shackles
¶ 139. The State filed a motion for restraints. Russell argues that the motion was granted without an evidentiary hearing. Actually there was a hearing on the motion before trial. Defense counsel said that it would agree to Russell's feet being *129 shackled but not either hand, and the shackling must be hidden from the jurors.
¶ 140. Russell cites Hickson v. State, 472 So.2d 379, 384 (Miss.1985), which states that "one on trial for life or liberty may in the presence of the jury be handcuffed or otherwise shackled only by reason of a clear and present danger to order or security." Russell argues that such danger must have arisen from the trial in question, and that a clear and present danger cannot arise from past events. We disagree. In this case there was the evidence of what the Russell was accused as to Officer Cotton; there was Russell's past conviction for armed robbery; and there was Russell's escape attempt from UMMC, which allegedly ended in a shoot-out.
¶ 141. Russell also cites the unsworn statements of Dorothy Fulwood; Robert Pitts; Herbert Hargett; and Adline White. The statements mentioned Russell's size and how he frightened these people. With only unsworn statements in support, which are vaguely related at best, we find that this issue is without merit.

Failure to Raise Issue of Intimidation of Witnesses
¶ 142. Russell states that defense counsel knew, or should have known, "that inmates at the prison had come under a great deal of pressure and could be intimidated by the MDOC." Russell does not say how defense counsel should have known this except to cite the unsworn statement of Grady Harris, who says he informed defense counsel that he had been threatened before testifying. Russell never states in detail what "active steps" defense counsel should have taken to remedy this.

Other Significant Issues Were Not Raised
¶ 143. Russell states that defense counsel failed to file enough pretrial motions, or adequately litigate the ones that were filed, and adds that "there were many others that should have been filed," but they are not named here.

J. INADEQUATE VOIR DIRE.
¶ 144. Russell next argues that defense counsel failed to ask the kinds of questions necessary to elicit the necessary information from the jurors, but does not specify. He alleges that "the manner in which counsel asked questions was ineffective," and that counsel was ineffective for not asking for individual sequestered voir dire. This issue was considered previously in this opinion. The circuit court conducted the original voir dire and then conducted death penalty voir dire in panels of twelve. It is difficult to tell from the record, but at one point a panel of six jurors was questioned, then twelve were brought in. Defense counsel objected on two occasions, stating that the jurors were not as responsive in the larger panels, and asked to go back to six man panels. The circuit court overruled this objection, so it is doubtful that a request for individual voir dire would have been successful. Russell alleges that counsel failed to make an adequate record so that issues arising from voir dire could be preserved. Finally, Russell alleges that defense counsel asked improper questions and made improper objections, such as where he objected to the question, "are you opposed to the death penalty." Counsel was arguing that a juror could be philosophically opposed and still follow the law. At any rate, the circuit court overruled defense counsel's objection.
¶ 145. Russell once again brings up the lack of individual voir dire. This issue was discussed previously.
¶ 146. Russell next argues that another factor showing that voir dire was inadequate was its length, or how short it was. Russell also argues that defense counsel asked no open ended questions, but does *130 not say what questions should have been asked.
¶ 147. It is correct that defense counsel stated that a verdict of the jury must be unanimous. While this is technically correct, Russell is correct that this is a potentially misleading argument if the jurors believe that only unanimous votes are allowed. Immediately after making this statement, defense counsel spent significant time asking each juror if they could hold their vote if all the other jurors voted the other way. This let the venire know that split votes were allowed.
¶ 148. Russell argues that defense counsel asked a "bizarre" question having to do with the jurors' feelings on the death penalty when the death is instant versus a slow death which is accompanied by suffering. The jurors agreed that such circumstances would make a difference to them. We do not find this to be an irrelevant question in this case.
¶ 149. Russell argues that defense counsel secured a commitment from the jurors that they would not hold it against Russell if he did not testify. This does not amount to ineffective assistance of counsel.

Inadequate Rehabilitation of Venirepersons Who were Opposed to the Death Penalty
¶ 150. Russell first argues Lynell Henderson was struck "because the defense did not make any kind of meaningful effort to rehabilitate the juror." Henderson stated that he was opposed to the death penalty, did not believe in capital punishment, was opposed and could not give the death penalty under any circumstances, was opposed to the death sentence and would look for a "lesser way out" and that he would opt for a lesser offense to get out of trying to decide the death penalty question. There were other times when Henderson almost said the right words to avoid being struck. The circuit court did not find that defense counsel failed to make a meaningful attempt at rehabilitation, but did find that defense counsel "in his attempt to rehabilitate some jurors basically acknowledged that Mr. Henderson ... [was] beyond rehabilitation." We agree.
¶ 151. Jewell Kelly Myles started out saying that she opposed capital punishment, that she did not think she could vote for it under any circumstances, that her beliefs on capital punishment would interfere with her vote on the guilty/not guilty phase, that she would look for a lesser offense in order not to have to deal with the death penalty vote and she would not return a death sentence under any circumstances. Her next answer was that she probably could, then she said she did not know, then she said it would be hard to do, and then she reiterated her earlier answer about voting for a lesser offense. Later she stated that she could vote for capital murder knowing it would lead to the sentencing phase, then she stated that she could weigh the aggravating and mitigating circumstances, and then she said she would not hold it against Russell if he did not testify. Defense counsel did not protest when Myles was struck, unlike when Henderson was struck. We cannot say that defense counsel was ineffective for failure to try harder to keep this juror.

Failure to Exclude Venirepersons Who Were in Favor of the Death Penalty
¶ 152. Russell argues that defense counsel failed to conduct adequate "Reverse-Witherspoon" voir dire. We assume that Russell means that jurors were not sufficiently questioned on whether they would automatically vote to sentence *131 Russell to death in any case in which he was convicted of capital murder. After review of voir dire of the five panels of jurors, defense counsel asked this question of each panel except one. The State also mentioned to every panel except one (not the same panel as mentioned in the previous sentence) that the death penalty was not automatic in the event Russell was convicted of capital murder.
¶ 153. Russell also labels as "bizarre" defense counsel's attempt to question the panel on the specific facts of the case, such where defense counsel asked about the death penalty where Russell was a convicted felon, and where he was accused of killing a prison guard. We do not find defense counsel ineffective in this matter.

Failure to Exclude Jurors Who Were Biased Against Russell
¶ 154. Finally, Russell argues that counsel was ineffective "for failing to identify and exclude jurors whose bias would have prevented them from being impartial in this case," but Russell does not specify any witnesses or how counsel should have extracted this particular information. Russell also states that "counsel failed to ensure that jurors who were closely related to law enforcement were struck either for cause or peremptorily," but mentions no jurors by name. Absent some specific allegation as to any specific juror we find that this issue is without merit.
K. INADEQUATE BATSON CHALLENGES.
¶ 155. Russell argues that defense counsel was ineffective for failure to raise a timely objection to the 1990 jury based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Second, Russell states that defense counsel "failed even to point out the power of the prima facie case, or the history of the abuse of peremptory challenges in this jurisdiction." Third, defense counsel failed to "demand either that the prosecution ask the questions that would have revealed the pretextual nature of their questions, or ask the questions themselves." Fourth, defense counsel "made no effort to prove that the State's challenges were entirely pretextual."
¶ 156. Defense counsel raised the Batson issue on direct appeal. We provided the following analysis:
Russell, a black man, was tried by a jury consisting of nine whites, two blacks, and one Oriental. In selecting the jury, the State used 11 of its challenges: 9 challenges against blacks, 2 challenges against whites; the defense used 10 of its challenges: 9 against whites and 1 against a black. Russell challenged the State's use of nine peremptory challenges against members of the black race, alleging its challenges constituted an impermissible practice under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State articulated reasons for all its challenges. The trial court found the State's reasons to be racially neutral and overruled the Batson Motion.
In examining this assignment of error [w]e give "great deference" to the trial court's findings of fact on this issue. [citation omitted]. As long as the trial court was within its authority when it determined that the State articulated a "neutral, non-race based explanation," we will not reverse.
We have carefully examined each of the reasons given by the State and find that the trial court was within its authority in declaring each reason to be racially neutral. This assignment is without merit. *132 Russell, 607 So.2d at 1110-11 (citations omitted).
¶ 157. Russell's argument is apparently that while defense counsel raised the issue, it could have been done better. Russell states that defense counsel did not timely raise the issue in the circuit court. While this is true, a record of the State's reasons for its strikes was eventually made, and the issue was raised on direct appeal and reviewed by this Court. Russell states that the race neutral reasons given by the State were false, and attaches unsworn statements from five persons who were struck from the venire, stating that the State's reasons were not accurate. Russell states that "Mississippi has refrained from mandating a particular procedure for trial courts to follow. Nevertheless, Mississippi requires that defense attorneys be afforded a meaningful opportunity to dispute the race-neutrality of the prosecutor's stated reasons for employing peremptory strikes." We find that defense counsel was given a meaningful opportunity to respond to the State on this issue. This issue is without merit.
L. FAILURE TO MAKE AN OPENING STATEMENT.
¶ 158. Russell argues that defense counsel was ineffective for failing to make an opening statement. Russell cites two cases from other jurisdictions where counsel was found to be ineffective for a multitude of shortcomings, one of which was a failure to make an opening statement. The State cites Manning v. State, 726 So.2d 1152, 1169 (Miss.1998), where we stated that "the decision to make an opening statement is a strategic one." In short, failure to make an opening statement certainly would be one factor to consider in making a determination of ineffectiveness, but by itself is not determinative.
M. FAILURE DEVELOP A MEANINGFUL AND CONSISTENT DEFENSE THEME.
¶ 159. Russell argues that defense counsel should have developed a theme for the defense at trial, primarily, the theme that Russell acted in self-defense. Defense counsel was able to raise this defense partially, but not to the extent desired by Russell, primarily because of Russell's failure to support it with his testimony. Russell next argues that if defense counsel was going to argue that the whole dispute between Russell and Officer Cotton was over the yeast and money, "then at least counsel should have introduced substantial evidence on why this was so much larger an issue in the context of a prison setting than it would be in the free world." While such a strategy might have been helpful, it would also have emphasized to the jury that Russell was in prison and needed to stay there. We find that this issue is without merit.
N. FAILURE TO PREVENT THE ADMISSION OF EVIDENCE OF PRIOR BAD ACTS.
¶ 160. Russell argues that defense counsel was ineffective for failure to "prevent comments on the prior record of the accused." Russell points to the testimony of Officer Rayford Jones who approached Russell immediately after he stabbed Officer Cotton. Officer Jones was called as a witness by the State, and testified on direct examination that he told other MDOC officers also approaching Russell to "let me try and talk him out of his knife cause this wasn't the first time that I had had an occasion to run into Russell and get something from him like that." Defense counsel objected based on relevance and the testimony amounting to evidence of another crime. The circuit court never said "sustained," but clearly felt the testimony was improper, as it directed *133 the State not to pursue this line of questioning, and instructed the jury to disregard the testimony. Officer Jones then stated that he told Russell that if he gave him the knife he would not hurt Russell and he would not let anyone else hurt him. Russell stated that this second bit of testimony "re-emphasized the past encounter." We disagree and find that defense counsel was not ineffective here.
O. INADEQUATE IMPEACHMENT.
¶ 161. Russell next argues that defense counsel failed to impeach various witnesses for the state. He specifically mentions Smith. As stated earlier, two problems with impeaching Smith's testimony is that (1) Smith's testimony is not that much different in key areas from Russell's own testimony and (2) Russell now asks that Smith's recantation of his previous testimony be taken seriously.
¶ 162. Womber was the next witness that defense counsel should have impeached. Russell argues that Womber's testimony was "prepped"; that he did not know how many times Russell had stabbed Officer Cotton; that Womber could not have seen Russell come out of his cell door; that Womber was wrong when he said Russell tried to stab Officer Lee; that Womber's statement that he had spoken to Russell about another inmate, Bobby Caldwell, selling knives was not true; and that Womber was lying when he said he did not know what inmates were yelling about during the stabbing.
¶ 163. We have no idea as to whether Womber's testimony was "prepped"; it appears of little consequence that Womber did not know the exact number of times Russell's knife actually hit Officer Cotton; that since Russell admitted how he got out of his cell, it is of little consequence as to whether Womber saw it or not; that Officer Lee testified that Russell "turned towards me and came towards me swinging the knife;" that there is nothing here from Caldwell as to whether the alleged conversation with Russell occurred or not; and we are not sure how defense counsel should have proved that Womber really did know what other inmates were yelling. Now that Womber has recanted his trial testimony, he is a reliable witness, according to Russell.
¶ 164. Russell next states that Officer Lee could have been impeached because of his misstatement of the time of the incident on one report and his identification of a unit register for the days prior to the date of the stabbing. Russell states that "a cursory glance at the copy of the register so identified reveals that it cannot be that same log, but is a substitute." Russell cites nothing further in support of this allegation. As for the wrong time on the report, this would have shown that Officer Lee was not perfect, but little else.
¶ 165. Officer James Bovan never testified in any of Russell's trials. It would have difficult to impeach him with his incident report.
¶ 166. Richard O. Williams, a criminal investigator for the Mississippi Highway Patrol, first testified that he became involved in the investigation of the stabbing in June 1989. He then corrected himself and stated July 1989. Russell says defense counsel should have "capitalized" on this. Trying to develop meaningful impeachment based on such a peripheral matter would have been a waste of time. We find that this issue is without merit.
P. FAILURE TO PRESENT IMPORTANT EVIDENCE.
¶ 167. Russell states that there was "substantial favorable evidence" that defense counsel should have presented, as well as witnesses who should have been called by the defense. Russell states that *134 this evidence was discussed in detail under other issues, so we will not attempt to discuss it in further detail here.
Q. WHETHER RUSSELL WAS ADEQUATELY ADVISED OF HIS RIGHT NOT TO TESTIFY.
¶ 168. Russell states that this issue, like the previous one, has been discussed in greater detail under other issues. Russell does say that "to the extent that counsel did not create a situation where there was a presumption of prejudice from the manner in which counsel effectively placed Russell in the position of having to tell something other than the whole truth, counsel prepared ineffectively to present their client on the witness stand." Russell next argues that defense counsel did not believe that Russell could be impeached with his prior statement to MHP Officer Rogers, but does not give any authority for this statement. The circuit court's order of May 10, 1990, which suppressed the statement, specifically stated that the statement was not suppressed as to "rebuttal or impeachment testimony." Russell states that defense counsel did not prepare him for the impeachment he faced with his own statement, but does not say how defense counsel should have prepared him to deal with a statement he made.
R. INADEQUATE GUILT PHASE CLOSING ARGUMENT.
¶ 169. Russell next argues that defense counsel made a brief and ineffective closing argument at the guilt phase of the 1990 trial, citing three specific deficiencies: counsel referred to Russell as a "dog," counsel did not argue self defense, and counsel did state that Russell was guilty of manslaughter.
¶ 170. A review of the record shows that defense counsel's closing argument spans eight pages. Defense counsel did state, in trying to explain Russell's way of life in prison of being under constant control of guards as far as sleeping, meals and showers, as being like a caged animal. Defense counsel stated that Officer Cotton, in taking Russell's money and not delivering the yeast, was in effect poking a caged dog or a caged animal, and this is what caused the rage and helplessness in Russell which eventually caused him to kill Officer Cotton.
¶ 171. Russell is also correct that defense counsel only briefly mentioned self-defense during closing argument, and that was in the context of a manslaughter instruction. Russell states that defense counsel should have been arguing self defense, but there was no evidentiary support for the self defense theory Russell raises now. The jury was instructed on self-defense, based apparently on Russell's belief that Officer Cotton was armed and about to use a knife, but defense did not argue this, probably because there was little testimony to support it. If defense counsel made a strategic decision to argue manslaughter as the strongest defense, we find that he was not wrong.
¶ 172. We dispute that defense counsel conceded on closing argument that Russell was guilty. Defense counsel argued that the jury should consider manslaughter in an attempt to keep Russell from getting the death penalty. We find that defense counsel was not ineffective here.
S. FAILURE TO ADVISE RUSSELL OF HIS RIGHT TO TAKE PART IN CLOSING ARGUMENT.
¶ 173. Russell states that defense counsel was ineffective for not advising him of his right to take part in closing argument, because if he had, "Petitioner clearly would have taken the opportunity to speak on his behalf in closing argument." This is the same Willie Russell *135 described by his attorneys in this petition as semi-literate and mentally retarded. Russell cites no authority for this speculative argument, which we find to be without merit.
T. INADEQUATE JURY INSTRUCTIONS FOR THE GUILT PHASE.
¶ 174. Russell argues first that defense counsel was ineffective for submitting an instruction, D-17, which states that "if you find that the State has failed to prove any one of the essential elements of the crime of capital murder, you must find the Defendant not guilty of capital murder and you will proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all the elements of a lesser crime of manslaughter." Russell points out that counsel actually argued the matter the other way around to the jury, urging them to consider manslaughter first. The State points out that we have found that this type of instruction, an "acquit-first" instruction, is not prohibited by the law of this State. Gray v. State, 728 So.2d 36, 75 (Miss.1998).
¶ 175. Russell next argues that defense counsel did not request a proper instruction on self-defense, and the State's instruction was also improper. As stated before, the State's self-defense instruction which was given was proper under the law at the time of Russell's trial. This issue is without merit.
XI. ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE OF THE 1993 TRIAL.
¶ 176. Russell alleges that, in the three years between the 1990 trial and the second sentencing trial, "counsel had not developed any other meaningful evidence for the penalty phase, made catastrophic and unjustifiable decisions in terms of what should be presented, and did not even seek to present evidence that the Supreme Court of Mississippi had suggested to be admissible." Since very little of what current post-conviction counsel has developed is meaningful, we do not fault trial counsel for failing to develop or present it earlier. Russell does not specify defense counsel's "catastrophic and unjustifiable decisions," and so we will not address these here. As to our suggesting that certain evidence was admissible, we assume that Russell refers to Officer Cotton and his alleged illegal dealings with other inmates. We did state, in Russell, 607 So.2d at 1116, that "the evidence discussed herein may well have been admissible during sentencing had Russell re-offered it." Russell did offer evidence during the first sentencing trial of his own dealings with gangs and how they had threatened him for interfering in an attack on a third inmate but did not offer evidence of Officer Cotton and his dealings with gangs. Defense counsel may have felt that introducing evidence which could be viewed as an attempt to smear the victim at this point would have done more harm than good. At the second sentencing trial, defense counsel could have attempted to introduce the evidence about Officer Cotton, but considering that there was still no connection between Officer Cotton, the gangs and the threat on Russell's life, this does not appear to have prejudiced Russell.
¶ 177. Russell alleges that counsel spent 1 3/4 hours with him in preparation for the second sentencing hearing. Russell cites nothing in support of this assertion. Russell again complains about the failure to introduce "the gang material, along with evidence of C.O. Cotton's misconduct." Once again we find that this evidence was not particularly relevant.
A. FAILURE TO FILE MERITORIOUS MOTIONS.
¶ 178. Russell's counsel filed a motion for change of venue for the second sentencing *136 hearing. Venue was changed to Montgomery County. Russell apparently argues that his counsel should have objected, because "the jury was likely to almost as closely linked to Parchman as the Sunflower County jury." This is an argument with no support, and it presupposes that counsel could have prevented the change to Montgomery County.
B. INADEQUATE VOIR DIRE LED TO JUROR MISCONDUCT.

Hattie Hopkins
¶ 179. Hattie Hopkins stated first that she could not impose the death penalty if the law and facts authorized it. She later reiterated this, stating that it was based on her religious and moral beliefs and her beliefs as a person. Russell's counsel later questioned her about how she felt about cases where there was one victim versus cases where there was more than one. Hopkins's answers were somewhat confusing, but she eventually stated that even with one victim, where the circumstances were "bad," she could not vote for the death penalty.
¶ 180. Russell now attaches Hopkins's unsworn statement, dated October 1999, where she says she was confused and could have considered the death penalty in a case involving the death of a prison guard. Even if Hopkins's statement could be considered, it is contradicted by the sworn testimony she gave at trial.

Elizabeth Moorman
¶ 181. Elizabeth Moorman was stricken for cause because she stated that "she didn't think they should lay it off on us," meaning she did not understand why the first jury had not sentenced Russell as well as convicting him. This was because the parties and the circuit court were trying to pick a jury, and explain the situation to the venire as well as they could without saying that Russell had already been sentenced to death once before, and that sentence had been reversed. Moorman also stood later when defense counsel asked for those who would "have a problem making a judgment of their fellow man." Moorman's unsworn statement, saying that she could have followed the law if only it had been explained to her, is attached. The circuit judge was of the opinion that Moorman was trying to get off the jury, and it is possible that defense counsel recognized this also.

Whether the Jury was Tainted by Extraneous Contacts
¶ 182. Russell cites the unsworn statement of juror Sarah Powell, dated May 22, 1997. This is a restatement of arguments presented in Issue IV. Powell's statement provides that "the deputies who drove us would ask us how we were thinking, which way we were leaning, when we were driving around." The statement does not say whether anyone on the jury ever answered.
¶ 183. Russell also cites the unsworn statement of juror Glenn Ray, who stated that a "bailiff or somebody told us [the jury] who the victim's family were in the courthouse." Russell does not state what defense counsel should have done to prevent this, but it does not rise the level of tainting the jury.

Whether the Jurors Were Tainted by Knowledge of the First Death Sentence
¶ 184. Previously, Russell argued that his situation was not properly and thoroughly explained to the venire. Here he argues that they knew too much, specifically, that Russell had been previously sentenced to death. Russell cites the statement of Sarah Powell as authority. If this unsworn statement can be considered, Powell does not state how or when she learned this, and Russell does not say what *137 his attorneys should have done to prevent this.
¶ 185. Petitioner also argues that insufficient voir dire resulted in the defense not learning that Sarah Powell's son was district attorney. According to the State, James Powell was not elected district attorney until November 1995. Petitioner's second sentencing hearing was held in 1993.
C. FAILURE TO OBJECT ADEQUATELY TO THE SECURITY MEASURES TAKEN AT TRIAL.
¶ 186. Russell cites the unsworn statement of Robbie Reed, who says that he was affected by the sight of Russell shackled to the floor. Reed was part of the jury venire but did not serve on the jury.
¶ 187. Russell also cites Sarah Powell again, who commented on the security and the fact that Russell was in prison clothes. This statement conflicts with the record of an earlier hearing where the circuit judge considered a motion by defense counsel to supply Russell with civilian clothes for the trial. The motion was denied but the judge noted that "the only thing that is required is that he not be in identifiable prison clothes, and I don't think he's going to be in identifiable prison clothes."
¶ 188. Russell also provides other statements about the heavy security at the trial and some disturbance during the trial which upset some people. This does not amount to ineffective assistance of counsel.
D. FAILURE TO PREVENT PROSECUTORIAL MISCONDUCT.
¶ 189. Russell next argues that defense counsel failed to prevent the State from exercising a peremptory challenge against William Georgia in a racially discriminatory manner. First, this is a peremptory challenge, so it is not clear what defense counsel was supposed to have done to try and prevent this, except object. Second, William Georgia may be an African-American, but this is not clear from the record.
¶ 190. Georgia first stated during voir dire that he would have a problem making a judgment of his fellow man. Georgia later stated during voir dire that he could listen to the evidence and follow the law. Georgia later stated in a unsworn statement dated October 17, 1999, that he could have followed the law and his religion would not have interfered with his decision. Defense counsel's inaction as to this one juror does not amount to ineffective assistance.
E. FAILURE TO EMPHASIZE MITIGATING CIRCUMSTANCES.
¶ 191. Russell next argues that defense counsel failed to emphasize the following factors in mitigation: Russell was under extreme mental disturbance at the time of the stabbing because he expected to be killed that day; Officer Cotton was a participant in the defendant's conduct; Russell acted under extreme duress; the capacity of Russell to conform his conduct to the requirements of the law were substantially impaired; Russell had told the authorities about the gang threats, and they had ignored him; Russell was only trying to wound Officer Cotton so he could be transferred to another unit; Russell was sorry for Officer Cotton's death; the stabbing of Officer Cotton was not the only cause of his death, but the delay in getting him to the hospital contributed; Russell had saved the lives of other inmates.
¶ 192. As for Russell's expectation that there would be an attempt on his life, once again, no one, including Russell, ever testified to this, so it could not have been a mitigating factor.
*138 ¶ 193. As for Officer Cotton being a participant in Russell's conduct, we find that the record does not support this.
¶ 194. As for Russell being under extreme duress, "as a man cornered," the record does not support this.
¶ 195. As for the impairment of the capacity of Russell to conform his conduct to the law, this is the same argument as above, stated another way.
¶ 196. As for Russell informing the authorities of the troubles he was having with gangs, Russell introduced evidence of this at his first sentencing hearing. It did not prevent the first jury from giving him a death sentence.
¶ 197. As for Russell not intending to kill Officer Cotton, Russell testified to this at the guilt phase of his first trial. It was apparently not helpful.
¶ 198. As for Russell being sorry for the death of Officer Cotton, he testified to this at the guilt phase of his first trial.
¶ 199. As for Russell not really being responsible for the death of Officer Cotton, which was instead due to the delay in getting Officer Cotton to a hospital, Russell has yet to cite any authority in support of such a defense. Anyway, such an argument is without merit because of the absence of any factual basis in support thereof. See, e.g., Morris v. State, 436 So.2d 1381, 1388 (Miss.1983) (addressing defendant's speculative and unsubstantiated argument).
¶ 200. As for Russell having saved the lives of other inmates, we are familiar with one fight that Russell helped break up. This evidence was presented at the guilt phase of Russell's first trial. We cannot say that defense counsel was ineffective for failure to emphasize these factors at the second sentencing hearing.
F. FAILURE TO INVESTIGATE OTHER MITIGATING CIRCUMSTANCES.
¶ 201. Russell called as witnesses during the second sentencing hearing Diane Shelby, his sister; Louise Robinson, his aunt; Gerald Jenkins, who had employed Russell at Southern Beverage Company; and Walter Kelly, who had grown up with Russell. Russell now argues that defense counsel was ineffective for failing to bring up or emphasize the following facts: Russell's family was poor when he grew up; Russell's mother died shortly after his birth; when Russell went back to live with father, the family was once again poor; Russell was a country boy who got in trouble when he moved to the city; and Russell's family loves him and needs him.
¶ 202. Diane Shelby testified about the poverty of the Russell family during Petitioner's childhood; what Russell was like growing up; and that he did not get into trouble until he left home. Louise Robinson testified that Russell was three weeks old when his mother died; that she helped keep Russell until he was about three years old; and that she had sporadic contact with him since then. Gerald Jenkins testified that he employed Russell at Southern Beverage, and what Russell's duties were; that he was a good employee and a hard worker; and that Southern Beverage had re-employed him on work release after he had been convicted of bank robbery. Walter Kelly testified that Russell was a good person when they went to high school together, but he had not had much contact with him since then.
¶ 203. Russell now offers the unsworn statement of Charles Herring, who apparently knew Russell when he was growing up and did testify at the original sentencing hearing; the affidavit of Rosie Russell, another of Russell's sisters; Louise Robinson, who did testify at the second sentencing *139 hearing; the unsworn statement of a daughter, Chantal Chambers; Willie Mae Williams, who knew Russell when he was growing up and was 86 and bedridden at the time she made her unsworn statement; and Sherman Matthews, Russell's high school football coach.
¶ 204. Much of what Russell argues should have been presented was presented, and is repetitive here. For each of these additional witnesses that might have been called, the State would have gotten another chance on cross-examination to emphasize that the witness had not been in contact with Russell recently because he had been in jail for so long, and the fact that he had killed a prison guard. The most potentially compelling testimony would have been from Russell's daughter, but her statement says that she was eighteen and a senior in high school in 1999, making her about twelve in 1993, and nine at the time of the original trial, which may have entered into the decision to call or not to call her as a witness. We find that counsel was not ineffective for failure to call this one witness.
G. FAILURE TO INVESTIGATE ADEQUATELY FOR THE PENALTY PHASE.
¶ 205. Russell next alleges that trial counsel did not investigate his life and background because they were incompetent, inexperienced and did not have sufficient funds for an investigator. Russell states that Mr. Stuckey spent a little over four hours locating and interviewing penalty phase witnesses, and cites Stuckey's affidavit as authority for this statement, but we find nothing concerning this in the affidavit. Russell also complains that trial counsel wrote to Diane Shelby in 1990 about visiting Russell, saying that it was wrong to rely on lay people "to think up something that might be mitigating." Actually, counsel had written to Shelby several months before Russell's 1990 trial in hopes that she and other family members might visit him and meet with counsel "about his case and your knowledge of him." To what extent she or the rest of the family responded is unknown, but Shelby did testify at the second sentencing hearing.
¶ 206. Next, Russell complains that James Green, an investigator for the Mississippi Capital Resource Center, supplied defense counsel with photographs of the house where Russell grew up, a limited selection of Russell's school records, and interviewed some family members, but these were not used. Russell states that counsel was not interested and only met with him once. Green's affidavit is vague on when he met with defense counsel. Defense counsel did attempt to introduce some photographs of the Russell house, but they were excluded because they had not been timely produced in discovery. This issue is without merit.
H. FAILURE TO PRESENT WITNESSES AT THE PENALTY PHASE WHO KNEW RUSSELL WELL.
¶ 207. Russell repeats the argument, made earlier, that defense counsel called the wrong witnesses, or called the right witnesses but asked them the wrong questions. Russell states that counsel should have called Rosie Russell, his sister who knew him best, instead of Diane Shelby, who testified that Russell attended community college. Russell states that this was not helpful to his claim that he was retarded, but never states that it was not true.
I. FAILURE TO OBTAIN ADEQUATE EXPERT EVIDENCE.
¶ 208. Russell first argues that the manner in which defense counsel asked for funds in part to obtain mental health *140 experts before the 1990 was deficient. Russell points to a motion for defendant's right to make ex parte applications, filed on March 16, 1990. The basis for this motion was that the State did not have any more right to have input in the selection of Russell's experts than Russell did on the experts used by the State. Defense counsel alleged in this motion that in making its request for these funds it would have to reveal to the court its theory of defense, results of investigation and other work product, along with contents of attorney-client conversations. At a hearing before the trial court on April 27, 1990, the circuit judge denied the motion, stating that "the rules say I can't have an ex parte hearing now." On May 30, 1990, defense counsel filed a motion for mental examination, asking that Russell be examined by Dr. Gil McVaugh, a psychologist. At a hearing on May 31, 1990, the circuit court announced that, due to a ruling of this Court in another case, it could have ex parte rulings on experts.
¶ 209. Russell states that even though defense counsel were aware that a similar motion in another capital case in the same district had been successful, they then proceeded to file a motion for mental examination, requesting in open court that Russell be examined by Dr. McVaugh. The circuit court eventually ordered Dr. McVaugh, Dr. Charlton Stanley, a psychologist, and Dr. Donald Guild, a psychiatrist, to examine Russell in preparation for trial. Russell complains that "counsel failed to secure their own evaluation of the client prior to exposing him to two state witnesses, both of whom would end up being witnesses against him in the penalty phase." The record shows that the trial court first denied defense counsel's request for an ex parte hearing and then came back later and said it would hold such a hearing only after defense counsel had filed the disputed motion to appoint Dr. McVaugh. Russell does not state how being evaluated before the "state's" doctors got to him would be any great advantage, as they would have eventually examined him anyway.
¶ 210. Russell next argues that defense counsel only obtained his medical and mental health records from the MDOC for the first time just before the second sentencing trial. Russell never states what was in these records that would have made a difference had they been obtained earlier.
¶ 211. Russell next argues that defense counsel had "little or nothing to present" at the 1993 sentencing hearing so defense counsel called Dr. Mulry Tetlow, a psychologist. Russell argues that this was "being done at the last minute," and Tetlow's work was "entirely inadequate," because it was done in a "hopeless time frame."
¶ 212. Dr. Tetlow was a clinical psychologist and taught at Holy Cross College in New Orleans. He had testified twice previously as an expert in capital sentencing cases in Mississippi. Tetlow stated that he saw Russell a week before his testimony, spent four hours interviewing him and administering psychological tests, and taped a portion of the proceeding. He did testify that "some of the data I'm still working on." Tetlow said that he spent eight hours reviewing files that he had been sent, including test reports of two unspecified psychologists and all raw data from Dr. Stanley's report. Tetlow also stated that he also had some reports on Russell's family history.
¶ 213. Dr. Tetlow had Russell take a drawing test, the Bender Visual Motor Gestalt Test, the Rorschach Ink Blot Test and a Thematic Apperception Test. Russell had already been given the Minnesota Multi-Phasic Inventory and Dr. Tetlow *141 had those results. Dr. Tetlow testified that Russell could be a candidate for organic brain damage because he had sniffed glue and had abused alcohol. Dr. Tetlow stated that neuropsychological test shows "definite brain damagedefinite organic dysfunction." Dr. Tetlow concluded that Russell suffered from underlying mental disorders which are the source of schizophrenia, and was suffering from this disorder when he killed Officer Cotton. Dr. Tetlow stated that he had spent about 40 hours working on the material. He denied that Russell's problem was that he had an anti-social personality disorder.
¶ 214. The State's rebuttal witnesses, Drs. McVaugh, Guild and Stanley, stated that Russell had an anti-social personality disorder.
¶ 215. Dr. Tetlow's affidavit is attached to Russell's amended petition. Dr. Tetlow states the following in his affidavit: that he met with defense counsel "for the first time shortly before I testified;" that "time constraints prevented him from coming to a more detailed diagnosis;" that he found fault with portions of each of the test results and testimony given by the State's experts; that defense counsel should have asked him about all this when he was on the stand and Dr. Tetlow was "incredulous" when they did not; that Dr. Tetlow's "critique of Dr. Stanley's report and testimony was an extremely important part of what I had to contribute to Mr. Russell's defense, and would have been crucially important to the case;" that "the trial lawyers apparently did not understand the crucial importance of the materials I had prepared, and did not possess the competence to use it in their cross-examination of Dr. Stanley. In my judgment, had they confronted Dr. Stanley with the evidence of his biased and unprofessional testimony, the jury and court would have had a much different appreciation of his testimony concerning Mr. Russell;" and finally, defense counsel should have asked for a continuance to give him more time.
¶ 216. Dr. Tetlow states that he did not have sufficient time, but with what time he did have he could have swayed the jury's decision. Dr. Tetlow assumes that if defense counsel had asked for a continuance it would have been granted. He states that if defense counsel had used him to attack the State's witnesses, particularly Dr. Stanley, or if they had used his work to attack Dr. Stanley, it would have made some kind of difference. We have reviewed Dr. Stanley's testimony and the cross-examination by defense counsel. Dr. Stanley appears at several instances during his testimony as colorful at best and callous and arrogant at worst. If the jury found him credible as he was, it is doubtful that any further attacks, even with Dr. Teltow's expert help, would have made a difference.
¶ 217. Russell then relies on the twenty-four page affidavit of Dr. Catherine L. Boyer, a psychologist from Alabama. Dr. Boyer states that all the mental health testimony, from Dr. Tetlow and the State, was flawed. Dr. Boyer makes some allowance for the time constraints put on Dr. Tetlow, but her primary conclusion is that everyone who analyzed Russell in this case performed poorly. Dr. Boyer states that a competent practitioner would have obtained a social and developmental history; chosen the psychological tests which would have been appropriate for Russell, taking into account his poor reading skills; gotten some competent neuropsychological testing done; and that the anti-social personality disorder diagnosis is prone to racial bias and could be applied to any number of inner-city African-American men who are being tried on criminal charges. Dr. Boyer never states who, with the requisite *142 competence, was ready, willing and able, in 1993, to take on Russell's case.
¶ 218. Russell next argues that defense counsel should have brought out more evidence that other members of Russell's family have mental problems. Russell specifically mentions that he has a sister and a nephew that are mentally retarded. If Russell had presented this evidence, the State could have pointed to other members of Russell's family that are not mentally retarded, such as Russell's sister that testified for him, and another sister and Russell's daughter that he now argues would have been good witnesses. Russell states that he "himself is mentally retarded," but the testimony on this is conflicting. Dr. McVaugh testified that Russell was mildly mentally retarded, Russell's IQ was 76, "borderline low to normal," and he was not retarded. This subject is discussed at length later in this opinion.
¶ 219. Defense counsel did introduce evidence through Dr. Tetlow that Russell has brain damage. Russell argues that defense counsel should have followed up on this, and developed and introduced more evidence of this kind. Each time more evidence of this kind was introduced, the State would have gotten another chance to emphasize how Russell received this brain damage: drug abuse, alcohol abuse and a dangerous criminal lifestyle. We cannot say that the pluses of such evidence would outweigh the minuses.
¶ 220. We do not know what other options on the subject of mental health experts might have been available to the defense. Dr. Tetlow may have been the only option. It appears that Dr. Tetlow was under some kind of time constraint, though the exact nature and cause is unclear. The constraints may have been substantial enough to hinder Tetlow's effectiveness as a witness.
¶ 221. By the time of the 1993 sentencing hearing Russell had been declared competent, declared sane and convicted of capital murder. The only question at this point was aggravating versus mitigating circumstances. We are unable to say that Dr. Tetlow's presentation was "half-baked." Even if defense counsel had done all that Russell now says should have been done, it is speculation to say that the result would have been any better or different. We cannot say that defense counsel's handling of expert witnesses in 1993 was ineffective.
J. FAILURE TO PRESENT A MEANING OPENING STATEMENT DURING THE PENALTY PHASE.
¶ 222. Russell states that defense counsel's opening statement was "thoroughly inadequate," but does not say why, except that it apparently was not long or detailed enough. Counsel stated that he was going to put on lay witnesses who knew Willie Russell so that the jury could know Russell better. Counsel also said that he would call an expert witness in the field of psychology. An opening statement can always be improved, but there does not appear to be any glaring deficiency in this one.
K. FAILURE TO OBJECT ADEQUATELY TO AN ORDER PERTAINING TO WHAT EVIDENCE WOULD BE ADMISSIBLE.
¶ 223. The circuit court entered an order on February 26, 1993, which prohibited the State from "offering, introducing any evidence on or otherwise making any reference to any of the enumerated aggravating circumstances" other than those found to exist by the jury in Russell's first trial. At trial, the circuit court found that the State should be able to introduce evidence of the actual killing. Defense counsel objected and raised this as an issue on *143 direct appeal. We found that the issue was without merit. See Russell, 670 So.2d at 832-33.
¶ 224. Russell states that this rendered counsel ineffective, in that "[i]t is not always counsel's voluntary action that may make counsel ineffective...." Russell cites no authority for the proposition that counsel may be ineffective except as a result of his own action or inaction. This issue is without merit.
L. FAILURE TO EXCLUDE EVIDENCE OF PRIOR BAD ACTS.
¶ 225. The two aggravating circumstances the State attempted to prove as to Russell were (1) the capital offense was committed by a person under sentence of imprisonment and (2) the defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person. The State offered proof of Russell's previous convictions for armed robbery, escape and kidnaping. Russell states now that defense counsel should have challenged the constitutionality of these convictions. We have found that the proper means for attacking prior convictions is by separate post-conviction actions in the respective court in which they occurred, and not in the court in which they are being used as aggravating factors or for enhancement purposes. See Holly v. State, 716 So.2d at 983.
¶ 226. Russell next states that his attorneys should have explored the details of his prior convictions. Apparently he is arguing that the jury should have heard more details of his prior convictions, not less. Russell mentions a few unsupported details about his prior convictions, such as in his robbery conviction, he only drove the getaway car; in another robbery he was framed by his girlfriend; and his escape was only a "matter of opportunism." Even if this had been admissible, and the jury believed Russell enough to put their finding on the second aggravator in doubt, there was still another aggravating circumstance to support his death sentence. This issue is without merit.
M. INEFFECTIVE CLOSING ARGUMENT DURING THE PENALTY PHASE.
¶ 227. Russell alleges that defense counsel failed to present an effective closing argument. He cites numerous cases from other jurisdictions discussing substandard, rambling, incoherent, perfunctory or lackluster arguments. Russell never states why these cases are applicable or how defense counsel's closing was deficient. This issue is without merit.
N. FAILURE TO PREVENT THE JURY BEING COERCED INTO A UNANIMOUS VERDICT.
¶ 228. Russell next alleges that defense counsel failed to prevent a verdict against him by providing the venire an incorrect statement of the law. In the passage cited by Russell, defense counsel appears to be arguing that any decision by the jury would have to be unanimous. This one passage, taken in isolation, could be taken as meaning that split votes are not allowed. The passage cited by Russell is from the first trial. It would have no effect on Russell's second death sentence, decided by a different jury. This issue is without merit.
XII. NEWLY DISCOVERED EVIDENCE.
¶ 229. Russell here states that his new version of what happened in this case, that he was acting in self-defense in response to a murder plot against him, is newly discovered evidence. If it is newly discovered that is because Russell never testified to it at trial or anywhere else before now.
XIII. OTHER NEWLY DISCOVERED EVIDENCE.
*144 ¶ 230. Russell states that he would not have gotten the death penalty if (1) the jury had heard his new version of the stabbing of Officer Cotton; (2) if the jury had heard about the history of retardation in his family and his poor upbringing; and (3) if the jury had heard about how important he is to his family. Some of this evidence was not presented to the jury because Russell never testified to it; some was not presented to the jury apparently due to strategy or its cumulative nature; and some was presented to the jury. It would be speculative to find that the evidence in question would have changed the jury's verdict.
XIV. WHETHER RUSSELL WAS INCOMPETENT TO STAND TRIAL.
¶ 231. This issue was also raised under Issue X.H., under the allegation of ineffective assistance of counsel. Russell alleges that he was incompetent during his 1990 trial because (1) of an overdose of some drug, alleged here by Russell to be Valium and (2) because he is retarded. While ineffective assistance of counsel could not have been raised until this petition, the issue of Russell's competence or lack thereof could have been raised on direct appeal but was not. While this argument is procedurally barred under Miss.Code Ann. § 99-39-21(1) (Rev.2000), the issue was fully addressed under Issue X.H. and is without merit.
XVI. WHETHER RUSSELL WAIVED HIS RIGHT NOT TO TESTIFY.
¶ 232. Once again, this issue could have been raised on direct appeal but was not. It is procedurally barred under Miss.Code Ann. § 99-39-21(1) (Rev. 2000).
XVII. WHETHER THE CONVICTIONS USED AGAINST RUSSELL WERE UNCONSTITUTIONALLY OR ILLEGALLY OBTAINED.
¶ 233. Russell makes a general statement to this effect and cites nothing in support. Russell states only that he has not been able to meaningfully investigate this issue because the State opposes discovery. This issue could have been raised on direct appeal but was not. It is procedurally barred under Miss.Code Ann. § 99-39-21(1) (Rev.2000). Procedural bar aside, this argument is without merit because Russell provides no factual substantiation in support.
XVIII. SUFFICIENCY OF THE EVIDENCE.
XIX. SUFFICIENCY OF THE EVIDENCE.
¶ 234. Russell briefly summarizes his earlier arguments which we have found to be without merit.
XX. WHETHER THE MANNER OF EXECUTION VIOLATES THE UNITED STATES CONSTITUTION AND INTERNATIONAL LAW.
¶ 235. Russell argues that the manner of execution in this case is unconstitutional, but cites no authority on this point. The State cites LaGrand v. Lewis, 883 F.Supp. 469 (D.Ariz.1995), and Felder v. Estelle, 588 F.Supp. 664 (S.D.Tex.1984), rev'd sub nom. Felder v. McCotter, 765 F.2d 1245 (5th Cir.1985), where lethal injection was found to be constitutional.
¶ 236. Russell also argues that it would be illegal and/or unconstitutional to execute him at this point because his long stay on death row, coupled with the conditions there, has amounted to cruel and unusual punishment in violation of the Eighth Amendment.
¶ 237. This issue was raised in Jordan v. State, 786 So.2d 987 (Miss.2001). We rejected the argument, stating:

*145 Jordan argues that he has been incarcerated on death row from the time the crime was committed in this case, in 1976, until 1991, and then again in 1998, when the life sentence was vacated, until now. He claims that he has suffered psychological trauma waiting for his execution and that there is nothing gained by the State from 22 years of needless infliction of pain and suffering. He indicates that the United States Supreme Court has held that the death penalty violates the Eighth Amendment when it makes no measurable contribution to acceptable goals of punishment, i.e., retribution and deterrence, and is nothing more than needless imposition of pain and suffering. Penry v. Lynaugh, 492 U.S. 302, 335, 109 S.Ct. 2934, 2956, 106 L.Ed.2d 256, 289 (1989). Jordan also points out that Justices Stevens and Breyer have opined that there may be a valid Eighth Amendment challenge for someone who has spent many years on death row. Lackey v. Texas, 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (memorandum of Stevens, J., respecting the denial of certiorari). However, a denial of certiorari has no precedential value. Moreover, Justice Thomas responded to Justices Stevens and Breyer when he noted that the Constitution would not protect a defendant who availed himself of the "panoply of appellate and collateral procedures" and then claimed that his execution had been too long delayed. Knight v. Florida, 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (Thomas, J., concurring in the denial of certiorari). There is no precedent which supports Jordan's contention that his Eighth Amendment right against cruel and unusual punishment has been violated. Therefore, there are no grounds for reversal on this issue.
Jordan, 786 So.2d at 1028; see also White v. Johnson, 79 F.3d 432 (5th Cir.1996) (inmate cannot choose to seek available state and federal review of death sentence and then complain of long time delays caused by these reviews). This issue is without merit.
XXI. WHETHER THE CLOSED COURTROOM WAS UNCONSTITUTIONAL.
¶ 238. James Green, who was an investigator for the Mississippi Defense Resource Center, stated the following in an affidavit: "During jury selection, the trial lawyers did not talk to me except to tell me to stay outside the courtroom. I later learned that both Ms. Castilla and myself were in some form banned from coming in by the judge. I never did find out what it was about, or what I could possibly have done that merited being excluded from a public courtroom. It did disturb me that Mr. Russell's lawyers did not tell me why I should be excluded."
¶ 239. Before voir dire, the State noted the presence of Carmen Castilla and James Green and objected to them having any contact with the jury. The circuit court agreed that this would be improper. As far as presence in the courtroom, the judge stated: "I think the law is that we have an open trial. I can't prohibit anybody from being in the courtroom." The circuit court stated that Castilla and Green could not sit in the courtroom and then leave and talk to witnesses.
¶ 240. This assignment of error, while procedurally barred, is without merit.
XXII. ATKINS v. VIRGINIA.
¶ 241. The United States Supreme Court recently decided, in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that execution of mentally retarded offenders amounted to cruel and unusual punishment and was therefore *146 prohibited by the Eighth Amendment to the United States Constitution. The Supreme Court based its decision in part on eighteen states which had enacted some kind of similar prohibition since 1986. The Supreme Court added:
To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." 477 U.S. 399, 405, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
Atkins, 536 U.S. at 317, 122 S.Ct. at 2250 (footnote omitted). The Court noted that "[t]he statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, supra," as stated below:
The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.
Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. at 2245 n. 3.
¶ 242. Russell argues that he has met his burden of production and the issue of whether or not he meets the definition of retardation we will adopt in light of Atkins must be submitted to a jury and proven by the State beyond a reasonable doubt. Russell cites in support the recent Supreme Court cases of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
¶ 243. Apprendi fired several shots into the home of an African-American family in Vineland, New Jersey. He was indicted on numerous state charges of shooting and possession of firearms and eventually pled *147 guilty to two counts of possession of a firearm for unlawful purpose and one count of possession of an explosive. After the judge accepted the guilty pleas, the prosecutor moved for an enhanced sentence on one of the counts on the basis that it was a hate crime. The judge concurred and rendered an enhanced sentence on twelve years on that particular count, with shorter concurrent sentences on the other two counts.
¶ 244. Apprendi argued that he was entitled to have the finding on enhancement decided by a jury. The Court agreed, stating: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 120 S.Ct. 2348. However, the Court specifically stated that "Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment.... We thus do not address the indictment question separately today." Id. at 477 n. 3, 120 S.Ct. 2348.
¶ 245. The Court found in Apprendi that New Jersey's statutory scheme would allow a jury to convict a defendant of a second degree offense of possession of a prohibited weapon, and then, in a separate subsequent proceeding, allow a judge to impose a punishment usually reserved for first degree crimes made on the judge's finding based on a preponderance of the evidence. The Apprendi Court finally stated that its decision did not apply to capital sentencing cases, even those cases where the judge was the one deciding whether to sentence the defendant to death or some lesser sentence, citing Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), where the Arizona capital sentencing process was upheld.
¶ 246. The Supreme Court subsequently decided Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Ring addressed the issue of whether the Arizona capital sentencing process as upheld in 1990 in Walton v. Arizona, that of a jury deciding guilt and a judge making findings on aggravating factors, could survive the Apprendi decision. The Court decided it could not. Despite the efforts in Apprendi to distinguish non-capital enhancement cases from aggravating circumstances in capital cases in this context, the Court in Ring found that there was no difference:
[W]e overrule Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. See 497 U.S., at 647-649, 110 S.Ct. 3047. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," Apprendi, 530 U.S., at 494, n. 19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury.
* * *
"The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered.... If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it." Duncan v. Louisiana, 391 U.S. 145, 155-156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a *148 defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both.
Ring, 536 U.S. at 609, 122 S.Ct. at 2443.
¶ 247. We find that not being mentally retarded is not an aggravating factor necessary for imposition of the death penalty, and Ring has no application to an Atkins determination.
¶ 248. The State argues that the burden of proof is on Russell in this matter, citing numerous statutes from other states which have prohibited execution of the retarded, and this state's post-conviction statute, Miss.Code Ann. § 99-39-23(7) ("no relief shall be granted under this chapter unless the prisoner proves by a preponderance of the evidence that he is entitled to such"). We agree.
¶ 249. The definition of mental retardation provided in Atkins is similar to that adopted by the Legislature in Miss.Code Ann. § 41-21-61(f) (2001), dealing with commitments, which states in part:
(f) "Mentally retarded person" means any person (i) who has been diagnosed as having substantial limitations in present functioning, manifested before age eighteen (18), characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work....
¶ 250. Russell states that he is retarded. The State disputes this, saying that he has not made a sufficient showing of retardation to be allowed to proceed further in the trial court. Dr. McVaugh testified that Russell was mildly mentally retarded. According to Dr. McVaugh's 1990 Psychological Evaluation of Petitioner, "[t]he Wechsler Adult Intelligence Scale Form R, Full Scale IQ of 68 indicates that this patient is currently functioning within the upper range of the mildly mentally retarded category of intelligence." Dr. Stanley testified that Petitioner's IQ was 76, "borderline low to normal," and he was not retarded.
¶ 251. After careful consideration we find that Russell should be granted leave to proceed in the trial court on the sole issue of whether he is mentally retarded such that he may not be executed under Atkins v. Virginia. To that end the standard or definition of mental retardation shall be that enunciated by the Supreme Court in Atkins, especially the American Psychiatric Association's definition of mental retardation. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders IV 39-46 (4th ed.1994). As Presiding Justice Smith recommends in his dissent, we further hold that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering. See id. at 683 (defining malingering as the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs"). See also United States v. Battle, 235 F.Supp.2d 1301, 1307 (N.D.Ga. 2001) (explaining MMPI and its validity scales and stating that "[t]he MMPI is generally agreed to be difficult to cheat on without getting caught"). Russell must prove that he meets the applicable standard by a preponderance of the evidence pursuant to Miss.Code Ann. § 99-39-23(7) (Rev.2000). This issue will be considered *149 and decided by the Sunflower County Circuit Court without a jury.

OTHER MOTIONS
¶ 252. On January 21, 1997, Russell's original trial attorneys, W.S. Stuckey and Whitman Mounger, filed a motion for post-conviction relief. At that time Stuckey and Mounger were still counsel of record for Russell. We find that the motion for post-conviction relief filed by Stuckey and Mounger should be denied.
¶ 253. In July 2001 Russell filed a pro se letter in which he complained about his treatment and asked to waive his appeals and set a date for his execution. Subsequently, Russell's post-conviction counsel filed a notice regarding State's motion. To the extent that these papers ask for relief we find that they should be dismissed as moot.

CONCLUSION
¶ 254. The amended petition for post-conviction relief filed by Willie C. Russell is denied except for the sole ground of Russell's alleged mental retardation. Russell is granted leave to proceed in the trial court on this sole issue of whether he is mentally retarded such that he may not be executed under Atkins v. Virginia. The standard or definition of mental retardation shall be that enunciated by the United States Supreme Court in Atkins. Russell must prove that he meets the applicable standard by a preponderance of the evidence pursuant to Miss.Code Ann. § 99-39-23(7) (Rev.2000). This issue will be considered and decided by the Sunflower County Circuit Court without a jury.
¶ 255. The motion for post-conviction relief filed on behalf of Russell in 1997 is denied. The letter request to stop ongoing death penalty appeals filed pro se by Russell is dismissed as moot. The notice regarding State's motion filed by post-conviction counsel is dismissed as moot.
¶ 256. AMENDED PETITION FOR POST-CONVICTION RELIEF IS GRANTED ON THE SOLE GROUND OF DETERMINATION OF MENTAL RETARDATION; AMENDED PETITION FOR POST-CONVICTION RELIEF IS OTHERWISE DENIED.
PITTMAN, C.J., COBB, CARLSON AND GRAVES, JJ., CONCUR. DIAZ, J., CONCURS IN RESULT ONLY. SMITH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. McRAE, P.J., NOT PARTICIPATING.
SMITH, Presiding Justice, Concurring in Part and Dissenting in Part.
¶ 257. I concur with the majority on all issues except the remand for re-hearing on the Atkins case as to whether Willie C. Russell is mentally retarded sufficient to avoid the death penalty. However, I would submit that the burden of proof regarding whether Russell is mentally retarded sufficient to avoid the death penalty is upon Russell, not the State. In fact, our Post-Conviction Collateral Relief Act is the only means available to Russell, and the Act absolutely places the burden of proof on the petitioner. Miss.Code Ann. §§ 99-39-23(7) (Supp.2002). Russell has not met his burden of proof, and accordingly this Court should dismiss his petition in its entirety.
¶ 258. Second, it is very clear from this record that Russell is not mentally retarded. In my view, the Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) decision by the United States Supreme Court is going to open the floodgates *150 to every inmate such as Russell, convicted of capital murder and appropriately sentenced, to now claim the defense of mental retardation in order to avoid the death penalty. Numerous unmerited, time consuming hearings by our trial judges will result creating more delay in justice being ultimately served. Here, the proof is sufficient under Atkins standards, and no additional hearing is necessary. Dr. Stanley testified that Russell had a full scale IQ of 76. Clearly, IQ alone is not determinative of whether Russell, or for that matter, any person is mentally retarded. Also, considering all the other evidence within this record regarding Russell's mental condition, it is equally clear that Russell is not retarded. There is simply no need to conduct another hearing. Post-conviction relief proceedings are for the purpose of pointing out to the Court "facts not known at time of judgment." Foster v. State, 687 So.2d 1124, 1129 (Miss. 1996); Williams v. State, 669 So.2d 44, 52 (Miss.1996). Here, Russell cannot be granted additional relief on post-conviction proceedings when he could have, should have, and if fact, did raise this very issue at trial and on direct appeal.
¶ 259. We should adopt the definition of mental retardation recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders IV (39, 4th ed.1994) as defined by the criteria set forth therein and which was relied upon by the Supreme Court in Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242. Using these criteria we could easily ascertain that there are many factors that could show that Russell is actually not retarded even though his IQ score is well above that of 70 used by the Supreme Court.
¶ 260. I commend the majority for to adopting the MMPI test as required on remand in death penalty cases. IQ tests do not have a "faking scale" to determine whether an inmate is trying to do poorly when being tested. This Court serves the ends of justice in requiring that an MMPI test which includes a "faking scale" be given so that one who in fact is faking and deliberately attempting to do poorly on an IQ test would be unmasked. The record here is sufficient that Russell is not mentally retarded. I would so find based on the existing record.
¶ 261. For these reasons, I respectfully concur in part and dissent in part.
EASLEY, J., JOINS THIS OPINION.
EASLEY, Justice, Concurring in Part and Dissenting in Part.
¶ 262. I must dissent from the majority's liberal decision to grant Willie C. Russell leave to proceed in the trial court as to his alleged mental retardation. As Russell has been previously evaluated, I do not believe that trial on this issue is warranted here. Russell was previously evaluated by Dr. Gil McVaughn, a psychologist, and Dr. Charlton Stanley, a psychologist. Dr. McVaughn determined Russell to be within the upper range of the mildly mentally retarded category of intelligence with an I.Q. of 68. Dr. Stanley testified that Russell's IQ was 76, borderline low to normal, and not retarded. Looking at these two evaluations together, I do not believe that Russell has met his burden of establishing that an issue exists as to his retardation sufficient to warrant a trial on this issue. The majority's liberal holding will open the jailhouse door for every murderer on death row to claim that they now fall below the minimum I.Q. I am deeply troubled by this apparent unsettling trend to weaken victim's rights. However, I concur on the other issues considered by this Court.